# EXHIBIT A-1

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

DANIEL L. COMER, GLEN HUBANKS, RICHARD D. SCOTT, OLIVER FRANK WRIGHT, JR. and STEPHEN SOLOMON, on behalf of themselves and all other persons similarly situated,

Plaintiffs,

Case No. 8:14-cv-000607-SDM-AAS

vs.

GERDAU AMERISTEEL US INC., and GERDAU AMERISTEEL US RETIREE MEDICAL PLAN,

Defendants.
_______________________________________/

# SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement"), dated as of June 2, 2017, is made and entered into by and among the following parties: (i) Daniel Comer, Glen Hubanks, Richard Scott, Oliver Frank Wright, Jr., and Stephen Solomon (collectively, "Plaintiffs"), each individually and on behalf of the Class (as defined below); and (ii) Gerdau Ameristeel US Inc. and Gerdau Ameristeel US Retiree Medical Plan (collectively, "Gerdau"), for the benefit of themselves and all of their Related Entities (as defined below). This Agreement is intended to fully, finally, and forever resolve, discharge and settle the Released Claims (defined below).

## I. The Litigation

Gerdau has provided medical benefits to Class Members in the past. It contends that it may modify, require the Class to pay more for, or cease providing altogether, such medical benefits, without limitation. Gerdau changed the nature of the medical benefits it provides to the

Class and required Class Members to bear more of the cost of medical benefits than they had borne in the past (the "Benefit Changes").

Plaintiffs contend that Gerdau must provide the Class with a certain set of medical benefits for life, without materially changing them or requiring Class Members to contribute more than a certain amount toward their cost, unless the Class or the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC ("USW") agree that they may. Plaintiffs filed the above-captioned lawsuit (the "Litigation") in response to the Benefit Changes.

II. Plaintiffs' Claims and Benefits of the Settlement

Based on their investigation of the merits of this dispute, the conduct of the Litigation to date, and their knowledge and experience pursuing such actions generally, Plaintiffs' Counsel believe that the settlement set forth in this Agreement will provide substantial benefits to the Class. When the benefits conferred by the settlement are weighed against the attendant risks of continuing to prosecute the Litigation, Plaintiffs' Counsel believe that the settlement is a reasonable and fair resolution of Plaintiffs' claims. In reaching such a conclusion, Plaintiffs' Counsel have considered, among other things, the risks of litigation (including the risks of establishing Defendants' liability), the time necessary to achieve a final resolution through trial and any appeals, the complexity of Plaintiffs' claims, and the benefits accruing to the Class under the settlement.

III. Denial of Liability

Gerdau denies each and every claim and contention Plaintiffs make in the Litigation, and maintains that it has the unfettered right to modify or terminate the medical benefits it provides to the Class. Nonetheless, Gerdau and defense counsel understand that the Litigation will be

protracted and expensive, and its outcome uncertain, and therefore that it is preferable to fully and finally settle the Litigation on the terms set forth in this Agreement.

IV. Terms of Settlement

A. Definitions.

As used in this Agreement, the following terms have the meanings specified below:

1. "Affiliated Entities" means any other entity that directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with Gerdau or Sheffield Steel Corporation ("Sheffield"). For the purposes of this definition, "control" when used with respect to any entity, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such entity, whether through the ownership, directly or indirectly, of more than 50% of the voting or equity securities or other interests of any such entity and/or by contract or otherwise.

2. "Class" means the certified class defined in the Court's June 12, 2014 Order (Dkt. 37), as later amended[1], as follows:

> 1. Retirees (and their spouses and eligible dependents) of the Sand Springs, Oklahoma, plant (the Plant) who (i) were represented during their employment by the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC (formerly known as the United Steelworkers of America, AFL-CIO/CLC) on behalf of Local 2741 (USW), (ii) retired from the Plant between September 1, 1981, and March 2, 2011, and (iii) were receiving or were eligible to receive retiree health care benefits from Gerdau as of December 31, 2012 (i.e., retired under the company pension plan on other than a deferred vested pension from a group of employees

[1] This Agreement contemplates the filing of a joint motion seeking to amend the class definition to conform to the definition of "Class" in this Agreement, and to clarify that the action has been certified as a non-opt out class action under Federal Rule of Civil Procedure 23(b)(1) and (2). In the event that the Court denies all or part of the Parties' joint motion, the Parties will revise this Agreement accordingly and resubmit a revised Agreement to the Court for preliminary approval.

designated by the company as covered by the Plan, and at the time of retirement had fifteen or more years of continuous service).

2.  Surviving spouses (and their eligible dependents) who (i) were receiving a surviving spouse's benefit under the company pension plan as the surviving spouse of either a retiree described in paragraph 1 or an active employee of the Plan who was represented by USW and died between September 1, 1981, and March 2, 2011, at a time when the employee was accruing continuing service in a group of employees designated by the company as covered by the Plan, and (ii) were receiving or eligible to receive retiree health care benefits from Gerdau as of December 31, 2012.

3.  All former employees of the Plant who were represented during their employment by USW (and their spouses, eligible dependents or surviving spouses) who were receiving or eligible to receive retiree health care benefits from Gerdau as of December 31, 2012, but do not fall within paragraph 1 or 2, above.

3.      "Class Members" means individuals comprising the Class, including Plaintiffs.

4.      "Claims" means all known and unknown claims, actions, allegations, demands, rights, liabilities and causes of action of every nature and description whatsoever, whether contingent or non-contingent, whether at law or equity, and whether asserted or unasserted, arising out of any or all of the acts, omissions, facts, matters, transactions, or occurrences that are, were or could have been alleged, asserted, or set forth in the Complaint or the Litigation.

5.      "Complaint means the Complaint filed in the Litigation on March 11, 2014, as subsequently amended on March 20, 2014, June 9, 2014, June 25, 2014, and November 23, 2015.

6.      "Final" means, with respect to any judicial ruling, judgment or order, that the ruling, judgment, or order remains in effect and that the period for any appeals, petitions, motions for reconsideration, rehearing or certiorari or any other proceedings for review ("Review Proceeding") has expired without the initiation of a Review Proceeding, or if a Review

Proceeding has been timely initiated, that there has occurred a full and final disposition of any such Review Proceeding without a reversal or modification, including the exhaustion of proceedings in any subsequent Review Proceeding, remand, and/or Review Proceeding after remand.

7.     "Final Fairness Hearing" means the Court hearing required by Fed. R. Civ. P. 23(e)(2) to determine whether the settlement is fair, reasonable and adequate and should be finally approved.

8.     "Final Settlement Approval" means the date on which the Judgment has become Final.

9.     "HRA" means Health Reimbursement Account.

10.    "Judgment" means a judgment rendered by the Court (i) in the form attached hereto as Exhibit 4, or (ii) a judgment (a) substantially similar to such form in both terms and cost, and (b) which is agreeable to each Party in its sole discretion.

11.    "Parties" means Plaintiffs and Gerdau (as defined in this Agreement).

12.    "Person" means an individual and his or her spouse, heirs, predecessors, successors, representatives, or assigns.

13.    "Plaintiffs' Counsel" means the law firms of Feinstein Doyle Payne & Kravec, LLC and Sugarman & Susskind, P.A.

14.    "Related Entities" means any past or present director, officer, employee, agent, board member, investor, shareholder, partner, attorney, predecessor, successor, assign, parent, subsidiary, division of Gerdau or Sheffield, and any Affiliated Entities of Gerdau or Sheffield.

15.    "Released Claims" shall collectively mean any and all Claims and Unknown Claims arising on or before the date of Final Settlement Approval:

      a.        under the LMRA, ERISA, and any other statute;

      b.        for breach of contract, breach of fiduciary duty, and any other common law claim or cause of action;

      c.        for insurance or employment benefits, interest, and attorney's fees;

      d.        for injunctive or other equitable relief;

      e.        for declaratory relief;

      f.        for damages, injunctive relief, disgorgement, the creation of a fund for future damages, statutory damages, punitive damages, special damages, exemplary damages, restitution, and any other form of damages or relief;

      g.        any other Claim that either has been asserted or could have been asserted by any Plaintiff or Class Member against Gerdau or Sheffield, in the Litigation or otherwise, based on, relating to, concerning, or arising out of the Benefit Changes or the allegations, facts, or circumstances described in the Litigation; or

      h.        any claim in connection with the basic life insurance benefit described in part IV.B.5., below.

Provided, however, Released Claims do not include:

      a.        Any claims for breach of this Agreement;

      b.        Any individual claims for benefits from a Gerdau-sponsored employee benefit plan arising in the ordinary course under the relevant plan documents, insurance policies, or ERISA;

      c.        Any claims by persons who are not Class Members; or

      d.        Any claims concerning any supplemental life insurance coverage a retiree Class Member has purchased through his or her employment with Gerdau or Sheffield,

whether such supplemental coverage is provided under the policy attached to this Agreement as Exhibit 2 or otherwise.

16. "Released Entities" means Gerdau Ameristeel US Inc., Gerdau Ameristeel US Retiree Medical Plan, Sheffield, all Related Entities, and all Affiliated Entities.

17. "Unknown Claims" means any Claims that any Class Member does not know or suspect to exist in his or her favor at the time of this settlement which, if known by him or her, might have affected his or her settlement with and release of Gerdau or Sheffield, or might have affected his or her decision not to object to and/or to participate in this settlement. With respect to any and all Released Claims, the Parties stipulate and agree that, upon entry of the Judgment, Plaintiffs expressly shall have, and each of the other Class Members shall be deemed to have, and by operation of the Judgment shall have, waived the provisions, rights, and benefits conferred by California Civil Code § 1542, and also any and all provisions, rights, and benefits conferred by any law of any state, province or territory of the United States, or principle of common law which is similar, comparable, or equivalent to California Civil Code §1542, which provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

One or more Class Members may hereafter discover facts in addition to or different from those that they now know or believe to be true with respect to the subject matter of the Released Claims, but the Plaintiffs expressly shall have, and each other Class Member shall be deemed to have, and by operation of the Judgment shall have fully, finally, and forever settled and released

any and all Released Claims. The Parties acknowledge, and the Class Members shall be deemed by operation of the Judgment to have acknowledged, that the foregoing waiver is a material element of the settlement of which this release is a part.

B. The Settlement

1. Exclusive Source of Future Rights. From the date of Final Settlement Approval onward, except as otherwise provided in this Agreement, this Agreement and the Judgment are the exclusive source of any and all rights and obligations between and among the Parties and the Class relating to medical benefits.

2. Release. Plaintiffs and all Class Members, on behalf of themselves and each of their respective heirs, executors, administrators, representatives, successors, assigns, agents, and attorneys, do hereby release, acquit, and forever discharge the Released Entities of and from all Released Claims. This release shall be effective upon Final Settlement Approval. Upon Final Settlement Approval, each Class Member shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever released, relinquished, and discharged all Released Claims.

3. Benefits. Gerdau will provide medical benefits to each Class Member as follows:

a. **For each Class Member age 65 and older:**

i. Gerdau will make contributions into a HRA ("HRA Contribution") each year for each of these Class Members until he or she dies. There will be no retroactive HRA Contributions for any periods preceding Final Settlement Approval. The HRA Contributions may be used to reimburse a Class Member for any qualified medical expense under the Internal Revenue Code; the terms of the HRA plan, as amended to account for the terms of this Settlement Agreement,

will govern the relationship of each of these Class Members and their HRA's.  If any balance remains in a Class Member's HRA at the end of a given year after all reimbursements have been made for that year, such balance shall be carried over to the subsequent year.

ii.     The 2017 HRA Contribution for these Class Members will be $1,800. On January 1 of each subsequent year, Gerdau will increase the amount of the annual HRA Contribution by 1.375%.

iii.     Gerdau will continue to offer the services of One Exchange or a comparable service provider so long as such providers exist and are commercially available in the marketplace, but Class Members will not be required to purchase coverage through One Exchange or the service provider selected by Gerdau in order to receive the HRA Contribution.

b.     **For each Class Member under the age of 65 who is eligible for Medicare as the result of disability:**

i.     The terms of paragraph B.3.a. (including, without limitation, the 1.375% annual increase) shall apply, except that Gerdau's 2017 HRA Contribution for each of these Class Members shall be $3,600.

ii.     Once each of these Class Members reaches age 65, the HRA Contribution for that person will decrease to the HRA Contribution amount then applicable to Class Members under paragraph B.3.a.

c.      **For each Class Member under the age of 65 and not eligible for Medicare as the result of disability**:

        i.      These Class Members are currently participating in, or are eligible to participate in, a retiree medical plan ("the Sheffield Plan"), as amended, and which has been incorporated into the Gerdau Ameristeel Retiree Medical Plan, effective January 1, 2011 and as amended through present date (the "Wrap Plan"). A complete copy of the Wrap Plan, along with the incorporated Sheffield Plan, as amended, is attached to this Agreement as Exhibit 1. Gerdau will amend the Wrap Plan as necessary to segregate the Sheffield Plan from the other plans incorporated into the Wrap Plan, and include the Wrap Plan's terms and the Sheffield Plan in a new, separate plan (the "Restated Sheffield Plan"). This Agreement will have no effect on Gerdau's ability to modify or terminate the Wrap Plan as it pertains to any individual or group other than these Class Members.

        ii.      Gerdau will allow retiree, retiree spouse, and surviving spouse Class Members in this group to participate in the Restated Sheffield Plan until the age of 65. Gerdau will allow dependent children Class Members in this group to participate in the Restated Sheffield Plan as long they qualify to participate under the terms of that plan or until no longer required by law, whichever is later. At that point, Gerdau will no longer provide medical benefits to ineligible dependent children. As retiree, retiree spouse, and surviving spouse Class Members turn 65, they will participate in the same arrangements as Class Members who are currently 65 or over, as described in B.3.a., above. If any Class Members in this

group become disabled before the age of 65, and thereby become eligible for Medicare as the result of disability, such Class Members will participate in the same arrangements as Class Members who are currently under age 65 and eligible for Medicare as the result of disability, as described in B.3.b., above.

iii. Gerdau will not change the terms of the Restated Sheffield Plan so long as there are eligible Class Members participating in the plan. When the last Class Member in this group exits the Restated Sheffield Plan, whether due to ineligibility, age, disability, or HRA-election under subpart (vi) below, Gerdau will terminate the Restated Sheffield Plan.

iv. Gerdau may change carriers or administrators of the Restated Sheffield Plan due to such entities coming or going from the market or due to service or cost increases, and such carriers or administrators may make non-material changes to plan design or provider/hospital networks so long as these changes do not substantively alter benefits.

v. Gerdau will contribute $8,820 to the annual cost of each Class Member's coverage under the Restated Sheffield Plan (the "Premium Contribution") for Class Members in this group. Class Members will pay the cost of their coverage under the Restated Sheffield Plan that exceeds the Premium Contribution.

vi. At any time after 8 years from the date of this Agreement, any Class Member still remaining in this group shall have the option to: (a) stay in the Restated Sheffield Plan until age 65 (for retirees, retiree spouses, and surviving spouses) or until ineligibility (for dependent children); or (b) by providing at least

30 days written notice to Gerdau, and effective January 1 following the provision of such notice, make an irrevocable election to participate in a HRA plan sponsored by Gerdau, with a prorated annual contribution of $8,820 per Class Member until such Class Member reaches age 65 (for retirees, retiree spouses, and surviving spouses) or otherwise becomes ineligible under the terms of the Restated Sheffield Plan or by operation of law, whichever is later (for dependent children). The contribution for dependent children will be deposited into the HRA held by the retiree, retiree spouse, or surviving spouse, as applicable; dependent children shall not be permitted to have an HRA independently from a retiree, retiree spouse, or surviving spouse. If a Class Member in this group elects the HRA option, such election will permanently preclude the Class Member from returning to the Restated Sheffield Plan. The HRA contributions described in this provision may be used to reimburse such Class Members for any qualified medical expense under the Internal Revenue Code, and if any balance remains in such Class Member's HRA at the end of a given year after all reimbursements have been made for that year, such balance shall be carried over to the subsequent year. When retirees, retiree spouses, and surviving spouses in this group that elect the HRA option reach age 65, Gerdau's payment into the HRA for each such person will reduce to the amount Gerdau is then paying for Class Members participating in the arrangement described in Part IV.B.3.a., and such person shall thereafter participate in the arrangement described at Part IV.B.3.a.

d. **HRA's:** As to all HRAs described above, Gerdau will choose the HRA administrator, which Gerdau may change from time to time in its sole discretion.

Upon the death of an HRA holder, the accumulated balance of the deceased HRA holder will be available to pay for the substantiated qualified medical expenses a surviving spouse, if any, and of the account holder's dependent children, but no one else, in accordance with the terms of the HRA plan. If there is no surviving spouse, or when any such surviving spouse dies, and there is no longer a dependent child of the account holder, the HRA balance will revert to Gerdau as provided by law and the HRA plan. Upon the death of an account holder whose HRA had been receiving contributions on behalf of one or more dependent children, such account balance shall continue to be available to such account holder's dependent children. All future contributions on behalf of the dependent child shall be made to the HRA of the account holder's surviving spouse. In the event that there is no HRA that can accept contributions on behalf of the account holder's child, Gerdau will pay an amount equal to the contribution attributable to the child that would have been made to such HRA if available, in cash to the dependent child.

4. Enrollment. Regardless of whether or not a Class Member is participating in a Gerdau-sponsored HRA or enrolled in the Sheffield Plan when the Court enters the Judgment, any Class Member will have the opportunity to enroll or re-enroll during the future annual enrollment windows for a Gerdau-sponsored HRA or the Restated Sheffield Plan (with the sole exception that non-disabled Class Members under age 65 who elect to participate in an HRA plan under the terms described in Part IV(B)(3)(c)(vi), above, will not be permitted to re-enroll in the Restated Sheffield Plan). All company contribution amounts described in Part IV.B.3. above, whether in the form of HRA Contribution, or contribution towards the cost of the

Restated Sheffield Plan, will be prorated. Any Class Member who is not participating in a Gerdau-sponsored HRA or enrolled in the Sheffield Plan must enroll to be entitled to benefits under this Settlement Agreement (including the basic life insurance benefits described *infra*).

5. Life Insurance. Gerdau currently affords certain retiree Class Members a basic life insurance benefit under the terms of the policy attached to this Agreement as Exhibit 2. Gerdau will provide to each retiree Class Member the basic life insurance benefit described in Exhibit 2, and will keep this basic life insurance benefit in place for each retiree Class Member, without modification, for his or her life. The amount of this basic life insurance benefit is as follows: (i) $20,000 if death occurs prior to age 62; (ii) $3,500 if death occurs at age 62 or later, and if the retiree retired on or after August 1, 1982; and (iii) $3,000 if the death occurs at age 62 or later, and the retiree retired before August 1, 1982. All retiree Class Members shall be eligible for the basic life insurance benefit described in this paragraph, notwithstanding any contrary or conflicting eligibility requirements in attached Exhibit 2. All other terms of Exhibit 2 remain in effect. Spouse, surviving spouse, and dependent children Class Members are not eligible for the basic life insurance benefit. Nothing in this Agreement shall affect any supplemental life insurance coverage that any retiree Class Member has purchased through his or her employment with Gerdau or Sheffield, whether such supplemental coverage is provided under the policy attached to this Agreement as Exhibit 2 or otherwise.

6. Lump Sum Payment. Gerdau will pay $225,000 in the aggregate towards reimbursing Class Members for the additional amounts Class Members were required to contribute towards the cost of participating in the Sheffield Plan, and/or for unreimbursed out-of-pocket medical expenses and premiums paid for substitute health insurance coverage, for the period from January 1, 2013 through Final Settlement Approval. Each Class Member will

receive an equal share of the $225,000 as his or her "Settlement Share." For Class Members with an existing Gerdau-sponsored HRA, Gerdau will allocate the Settlement Share to the Class Member through a one-time contribution to the HRA within 20 days of Final Settlement Approval. For all other Class Members, Gerdau will issue and mail checks in the amount of the Settlement Share to each Class Member (or his or her estate) within 20 days of Final Settlement Approval. If any such checks have not cleared Gerdau's account 90 days after issuance, Gerdau will void and stop payment on such checks, and the sum of such checks will be reallocated through equal contributions to the HRAs of those Class Members with an HRA.

7. Attorneys' Fees. Gerdau has agreed to pay $725,000, and no more, to resolve Plaintiffs' claims for attorneys' fees. At least 45 calendar days before the Final Fairness Hearing, Plaintiffs shall apply to the Court for an award of attorneys' fees and the reimbursement of their costs and expenses. Defendants shall not oppose, directly or indirectly, Plaintiffs' application for attorneys' fees, costs, and expenses, provided that Plaintiffs do not request an award of attorneys' fees, costs, and expenses greater than $725,000. Under no circumstances shall Gerdau pay, or be ordered to pay, more than $725,000 toward Plaintiffs' attorneys fees, costs, and expenses.

8. Legality. Gerdau shall not be obligated to provide any benefits under Part IV.B.3 in violation of the law. In the event that any obligation to provide any benefits under Part IV.B.3 is determined to be unlawful, Gerdau shall satisfy such obligation in any legal manner available to it that preserves and delivers the economic value of the benefit to the Class Member, but under no circumstances to exceed the cost to Gerdau, as agreed to and detailed in Part IV.B.3.

9. Nullification. Should the Court not approve this settlement or approve it only upon modifying one or more of its material terms, any Party has the option to nullify this

Agreement and any material modifications of its terms by notifying the other Party of its desire to do so. Whether a term is "material" is within the sole discretion of each Party.

10. No Admission. This Agreement is entered into to resolve disputed claims. This Agreement is not to be construed as an admission of liability by any Party, all such liability being denied.

11. Governing Law. This Agreement shall be governed in all respects by the laws of the State of Florida, without regard to any choice-of-law or conflict-of-law provisions thereof, except to the extent that the law of the United States governs any matter set forth herein, in which case such federal law shall govern.

12. Authority, Negotiating and Drafting. The Parties represent and warrant that they are fully authorized to execute this Agreement. This Agreement results from negotiations between the Parties, and shall not be construed against any Party since each Party has had an opportunity to modify it.

C. Court Approval

1. As soon as practicable after the execution of this Agreement, Plaintiffs' counsel and Gerdau's counsel shall file this Agreement with the Court, and Plaintiffs' counsel shall file a motion for preliminary approval of the settlement and apply for entry of an order (the "Order of Preliminary Approval"), in the form attached hereto as Exhibit 3 or a substantially similar form, requesting, *inter alia,*

a. Preliminary approval of the settlement as set forth in this Agreement; and

b. Approval of a customary long form of notice ("Notice") in a form and format mutually agreed upon by the Parties, to be delivered by Gerdau to Class Members. The Notice shall include a fair summary of the Parties' respective litigation positions, the general

terms of the settlement set forth in this Agreement, instructions for how to object to the settlement, the amount of attorneys' fees being sought by Plaintiffs, and the date, time, and place of the Final Fairness Hearing.

2. Gerdau shall pay for and shall assume the administrative responsibility of providing notice to the Class in accordance with the Order of Preliminary Approval. Such notice shall be provided by first-class mail to each Class Member household's last known address within 7 calendar days following the Court's entry of the Order of Preliminary Approval. In the event a Notice is returned as undeliverable, the Defendants shall make reasonable efforts to promptly obtain a valid mailing address and resend the Notice to the updated address. At least 10 days before the Final Fairness Hearing, Gerdau shall cause to be filed with the Court an appropriate affidavit or declaration to the effect that it has complied with this provision.

3. After notice is given, Plaintiffs shall ask the Court to grant final approval of the settlement set forth in this Agreement following a Final Fairness Hearing.

D. Objection Procedure.

1. Each Class Member who wishes to object to the settlement shall file with the Court a timely written notice of his or her objection.

2. Such notice shall state: (i) the objector's full name, address, telephone number, and email address; (ii) all grounds for the objection, including any legal support for the objection; (iii) copies of any documents upon which the objection is based; (iv) the name and address of any attorney representing the objector; (v) whether the objector will appear at the Final Fairness Hearing; and (vi) a list of all persons who will be called to testify at the Final Fairness Hearing in support of the objection.

3. To be timely, such notice must be filed with the Clerk of the United States District Court for the Middle District of Florida, Sam M. Gibbons U.S. Courthouse, 801 North Florida Ave., Tampa, Florida, 33602, 30 days prior to the date of the Final Fairness Hearing as set forth in the Notice, and served upon both Plaintiffs' counsel and Gerdau's counsel at the addresses set forth in the Notice.

E. Effectiveness of Settlement.

1. This settlement shall become effective upon the occurrence of all of the following events:

a. The Court enters the Order of Preliminary Approval and Publishing of Notice of Final Fairness Hearing;

b. The Court enters the Judgment;

c. The Judgment becomes Final.

2. If one or more of the events described immediately above do not occur as provided in this Agreement, this Agreement terminates pursuant to the following provision unless the Parties agree in writing otherwise.

3. In the event the Court does not approve this Agreement, or approves it with a material modification that is unacceptable to any Party, or this Agreement terminates in accordance with its terms,

(a) the Parties shall be restored to their respective positions in the Litigation as if they never entered into this Agreement, and shall jointly ask the Court to extend all Litigation deadlines so as to avoid prejudice to any Party, and

(b) the terms of this Agreement shall have no further force or effect, and shall not be used in the Litigation or in any other proceeding for any purpose, and any judgment or

order entered by the Court in accordance with the terms of this Agreement shall be treated as vacated, *nunc pro tunc.*

4. Notwithstanding any other provision of this Agreement, neither the amount of attorneys' fees, costs, and expenses awarded to Plaintiffs (unless in excess of $725,000), nor any ruling on the manner of allocating the $225,000 Lump Sum Payment shall constitute grounds for cancellation or termination of this Agreement. Under no circumstances will Gerdau pay or be ordered to pay in excess of $725,000 for Plaintiffs' attorneys' fees, costs, and expenses.

F. Miscellaneous

1. The Parties: (a) acknowledge that it is their intent to consummate this Agreement; and (b) agree to cooperate to the extent reasonably necessary to effectuate and implement all terms and conditions of this Agreement, and any applicable requirements under the Class Action Fairness Act of 2005.

2. The Parties intend this settlement to be a final and complete resolution of all disputes between them with respect to the Litigation. The settlement compromises claims that are contested and shall not be deemed an admission by any Party as to the merits of any claim or defense. The Parties all agree that the settlement was negotiated in good faith by the Parties, and reflects a settlement that was reached voluntarily after consultation with competent legal counsel. The Parties reserve their right to rebut, in a manner that such party determines to be appropriate, any contention made in any public forum that the Litigation was brought or defended in bad faith or without a reasonable basis.

3. Neither this Agreement, nor the settlement contained herein, nor any act performed or document executed pursuant to or in furtherance of this Agreement or the settlement: (a) is or may be deemed to be, or may be used as an admission of, or evidence of, the

validity or lack thereof of any Released Claim, or of any wrongdoing or liability of any Released Party; or (b) is or may be deemed to be, or may be used as an admission of, or evidence of, any fault or omission of any Released Party, in any civil, criminal, or administrative proceeding in any court, administrative agency, or other tribunal. Any Released Party may file this Agreement and/or the Judgment in any action that may be brought against it in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction or any other theory of claim preclusion, issue preclusion or similar defense or counterclaim.

4. This Agreement may be amended or modified only by a written instrument signed by or on behalf of all Parties. All such amendments and modifications which materially affect the terms of the settlement must be approved by the Court.

5. This Agreement, together with its Exhibits, constitutes the entire agreement among the Parties and no representations, warranties, or inducements have been made to any party concerning the Agreement other than the representations, warranties, and covenants contained and memorialized in this Agreement. Except as otherwise provided in this Agreement, each party shall bear its own costs.

6. Each counsel or other Person executing this Agreement on behalf of any Party hereby warrants that such Person has the authority to do so.

7. This Agreement may be executed in one or more counterparts. All executed counterparts and each of them shall be deemed to be one and the same instrument. A complete set of original executed counterparts shall be filed with the Court.

8. The Court shall retain jurisdiction with respect to implementation and enforcement of the terms of this Agreement, and all Parties submit to the jurisdiction of the Court for purposes of implementing and enforcing the settlement embodied in this Agreement.

Dated: June 2, 2017

PLAINTIFFS DANIEL L. COMER, GLEN HUBANKS, RICHARD D. SCOTT, OLIVER FRANK WRIGHT, JR. and STEPHEN SOLOMON

Joel R. Hurt
William T. Payne
Pamina Ewing
Ruairi McDonnell
FEINSTEIN DOYLE PAYNE & KRAVEC, LLC
429 Fourth Avenue
Law & Finance Building, Suite 1300
Pittsburgh, PA 15219
Telephone: (412) 281-8400
Facsimile: (412) 281-1007

Email: jhurt@fdpklaw.com
wpayne@fdpklaw.com
pewing@fdpklaw.com
rmcdonnell@fdpklaw.com

Ivelisse Berio LeBeau
Robert Sugarman
SUGARMAN & SUSSKIND, P.A.
100 Miracle Mile, Suite 300
Coral Gables, FL 33134
Telephone: (305) 592-2801
Facsimile: (305) 447-8115

Email: ivelisse@sugarmansusskind.com

*Counsel for Plaintiffs and the Class*

Dated: June 2, 2017

DEFENDANTS GERDAU AMERISTEEL US INC., and GERDAU AMERISTEEL US RETIREE MEDICAL PLAN

, on behalf of Brett Preston

Brett J. Preston
David L. Luikart
Carolina Y. Blanco
HILL WARD & HENDERSON, P.A.
101 East Kennedy Blvd., Suite 3700
Post Office Box 2231
Tampa, FL 33601
Telephone: (813) 221-3900
Facsimile: (813) 221-2900

Email: brett.preston@hwhlaw.com
dave.luikart@hwhlaw.com
carolina.blanco@hwhlaw.com

*Counsel for Defendants*

# EXHIBIT 1

# WRAP PLAN INCLUDING SHEFFIELD PLAN

**WRITTEN CONSENT**
**OF THE**
**BOARD OF DIRECTORS**
**OF**
**GERDAU AMERISTEEL US INC.**

The undersigned, being all of the members of the Board of Directors of Gerdau Ameristeel US Inc. (the "**Corporation**"), finding it inconvenient to assemble in formal meeting, do hereby adopt the following resolutions pursuant to the provisions of Section 607.0821, Florida Statutes, in lieu of a special meeting:

**Amendment and Adoption of Plan Documents**

**WHEREAS,** the Corporation previously adopted the following plans for the benefit of its eligible employees, eligible retirees, and their eligible dependents: (1) the Gerdau Ameristeel Health and Welfare Benefits Plan (the "Welfare Plan"), (2) the Gerdau Ameristeel Cafeteria Plan (the "Cafeteria Plan"), (3) the Gerdau Ameristeel Retiree Medical Plan (the "Retiree Medical Plan"), and (4) the Gerdau Ameristeel Dependent Care Flexible Spending Account Plan (the "Dependent FSA"), (the Welfare Plan, Cafeteria Plan, Retiree Medical Plan, and Dependent FSA collectively referred to herein as the "Plans"); and

**WHEREAS,** the Corporation is authorized to amend the Plans; and

**WHEREAS,** the Gerdau Ameristeel Dental Plan (the "Dental Plan") and the Gerdau Ameristeel Vision Plan (the "Vision Plan") have each heretofore been component plans of the Welfare Plan; and

**WHEREAS,** the Corporation deems it advisable to remove the Dental Plan and Vision Plans from the Welfare Plan, and establish each such plan as a separate, stand-alone plan for regulatory compliance and other purposes; and

**WHEREAS,** the Corporation deems it advisable to amend and restate the terms of the Cafeteria Plan, the Retiree Medical Plan, and (once removed from the Welfare Plan) the stand-alone Dental Plan and stand-alone Vision Plan to incorporate all previous amendments with effective dates up to and including January 1, 2011, as applicable, for each of those plans; and

**WHEREAS,** the Plans provide that Affiliates (as defined in the applicable Plan documents) may adopt the Plans upon written consent of the Company, and the Company desires to consent to such adoption by its Affiliates who affirmatively elect to do so.

**NOW, THEREFORE, BE IT RESOLVED,** that the amended and restated Cafeteria Plan (a copy of which is attached hereto as Exhibit A) be, and it hereby is, approved and adopted in all respects, to be effective as of January 1, 2011.

**RESOLVED,** that the amended and restated Retiree Medical Plan (a copy of which is attached hereto as Exhibit B) be, and it hereby is, approved and adopted in all respects, to be effective as of January 1, 2011.

**RESOLVED,** that the Dental Plan be, and hereby is, removed from the Welfare Plan, and hereby established as a stand-alone plan.

**RESOLVED,** that the amended and restated Dental Plan plan and summary plan description document, a copy of which is attached hereto as Exhibit C, be, and it hereby is, approved and adopted in all respects, to be effective as of January 1, 2011.

**RESOLVED,** that the Vision Plan be, and hereby is, removed from the Welfare Plan, and hereby established as a stand-alone plan.

**RESOLVED,** that the amended and restated Vision Plan plan and summary plan description document, a copy of which is attached hereto as Exhibit D, be, and it hereby is, approved and adopted in all respects, to be effective as of January 1, 2011.

**RESOLVED,** that the Company hereby consents to the adoption of the Plans by the Affiliates that affirmatively elect to do so by written action.

**RESOLVED,** that in furtherance of the approval and adoption of the proceeding resolutions, the proper officers, benefits director, and the benefits manager of this Corporation be, and each of them hereby is, authorized and directed in the name and on behalf of this Corporation to make such non-substantive changes in the form, terms, and provisions of the Plan documents attached to this written consent as any of them in consultation with legal counsel deem necessary or appropriate.

**Further Action**

**RESOLVED,** that the officers, benefits director, and the benefits manager of this Corporation be, and they hereby are, authorized and directed in the name of and on behalf of the Corporation, and under its corporate seal, or otherwise, to take such additional actions and execute such documents as they deem necessary or appropriate to carry out the intent and accomplish the purposes of the foregoing resolutions.

**Counterpart Execution**

**RESOLVED,** that the directors of this Corporation be, and each of them hereby is, authorized to execute this written consent in one or more counterparts and that, upon such execution by all of the directors of this Corporation, this written consent be, and as of that time it hereby is, approved and adopted as the act and deed of the Board of Directors of this Corporation.

*{Signature Page Follows}*

**Written Consent of the Board of Directors of Gerdau Ameristeel US Inc.** **Page 3**

Dated this 22nd day of December, 2010, but effective for all purposes as of January 1, 2011.

Mario Longhi

Barbara Smith

Robert E. Lewis

# Exhibit B

Gerdau Ameristeel Retiree Medical Plan

# AMENDMENT AND RESTATEMENT OF

# THE GERDAU AMERISTEEL RETIREE MEDICAL PLAN

# OFFICIAL PLAN DOCUMENT

**Effective January 1, 2011**

## Part 1
## Introduction

The Gerdau Ameristeel Retiree Medical Plan (the "Plan") is maintained by Gerdau Ameristeel US Inc. (the "Company") for the exclusive benefit of, and to provide certain welfare benefits (the "Benefits") to eligible former employees of the Company (and of any affiliated employer that adopts the Plan with the consent of the Company), their spouses and eligible dependants.

Medical Benefits are currently provided under the plans listed in Exhibit A, which is hereby incorporated as an integral part of this document. The plans listed in Exhibit A are each referred to as a "Retiree Medical Plan," and collectively referred throughout this Plan as the "Retiree Medical Plans."

Each of the Retiree Medical Plans is part of, and hereby incorporated into, the Plan. Each of the Retiree Medical Plans provides Benefits, and is applicable to groups of former employees and their Spouses and eligible Dependents, as described further in the applicable summary plan descriptions ("SPDs") of, and/or Benefit booklets related to, each of the Retiree Medical Plans, which SPDs and Benefit booklets are incorporated as part of the Plan.

This document, together with the SPD and/or Benefit booklet related to each of the Retiree Medical Plans, as amended and restated as of the Effective Date, constitutes the "Plan Document" as required by the Federal law known as the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). Keep this document and the applicable SPDs and Benefit booklets, and refer to them when you have questions. Please direct any questions that are not fully answered by this document or the applicable SPD and Benefit booklet to the Plan Administrator at (800) 637-8144.

## Part 2
## Definitions

A. "**Affiliate**" shall mean, with respect to an Employer, any legal entity, other than such Employer, that is a member of a controlled group of corporations, within the meaning of Section 414(b) of the Code, of which such Employer is a member; all other trades or businesses (whether or not incorporated) under common control, within the meaning of Section 414(c) of the Code, with such Employer; any service organization other than such Employer that is a member of an affiliated service group, within the meaning of Section 414(m) of the Code, of which such Employer is a member; and any other entity required to be aggregated with the Employer pursuant to Treasury regulations promulgated under Section 414(o) of the Code.

B. "**Board of Directors**" and "**Board**" shall mean the board of directors of the Company or, when required by the context, the board of directors of an Employer other than the Company.

C. "**COBRA**" shall mean the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

D. "**Code**" shall mean the Internal Revenue Code of 1986, as amended, or any successor statute. Reference to a specific section of the Code shall include a reference to any successor provision.

E. "**Company**" shall mean Gerdau Ameristeel US Inc.

F. "**Dependent**" shall mean an Eligible Retiree's:

1. Spouse;

2. Unmarried children under age 19;

3. Unmarried children up to age 25 who are enrolled in and regularly attending a full-time accredited school, college, or university, or a licensed technical or specialty school, and also solely dependent on the Eligible Retiree for support; or

4. Unmarried children age 19 and over who are not able to support themselves due to a mental retardation, physical disability, mental illness or developmental disability that was present prior to age 19, and who are also solely dependent on the Eligible Retiree for support.

For purposes of the definition of "Dependent," the term children shall mean only the Eligible Retiree's natural children, step-children, adopted children, and those children placed with the Eligible Retiree for adoption. A child is considered placed for adoption on whichever date occurs first: (i) in the case of an agency adoption, from the date of adoptive placement as specified in the adoptive placement agreement; (ii) in the case of an independent adoption, from the later of the date of placement of the child in the physical custody of the Eligible Retiree or the date of the filing of the petition for adoption with the probate court; or (iii) the date the Eligible Retiree assumes the legal obligation for the total or partial support of the child in anticipation of adoption.

Each of the Retiree Medical Plans may impose additional requirements, restrictions, and limitations on which individuals constitute a dependent eligible under the applicable plan. Refer to the applicable SPD and/or Benefits booklet for additional information.

G. "**Effective Date**" shall mean January 1, 2011, except as otherwise specified herein.

H. "**Eligible Retiree**" shall mean, with respect to each Retiree Medical Plan, a Retiree who is eligible to participate under the terms of that Retiree Medical Plan.

I. "**Employer**" shall mean the Company or any Affiliate that adopts this Plan with the consent of the Company.

J. "**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended, or any successor statute.

K. "**HIPAA**" shall mean the Health Insurance Portability and Accountability Act of 1996, as amended.

L. "**Insurance Contract**" shall mean any contract issued by an Insurer providing a Benefit.

M. "**Insurer**" shall mean any third party with whom an Employer may contract to provide any of the non-cash Benefits. For purposes of the Plan, the term "Insurer" shall also include any third party with whom an Employer contracts to provide coverage (other than major medical coverage) under the Life Insurance Plan.

N. "**Open Enrollment Period**" shall mean the two (2) week period in November preceding a Plan Year, as selected by the Plan Administrator, or other period prescribed by the Plan Administrator.

O. "**Plan**" shall mean the Gerdau Ameristeel Retiree Medical Plan as set forth in this document and any related instruments, as amended from time to time.

P. "**Plan Administrator**" shall mean the Gerdau Ameristeel Benefit Plans Administrative Committee.

Q. "**Plan Year**" shall mean the consecutive twelve-month period commencing on January 1 and ending on December 31.

R. "**Retiree**" shall mean, except as otherwise provided, an individual who is a former employee of an Employer whose employment with such Employer terminated by reason of retirement, and who was, as of such retirement date, eligible to participate in a Retiree Medical Plan.

S. "**Spouse**" shall mean the legal spouse of a Retiree.

**Part 3**
**Eligibility and Participation**

A. **Eligibility.** The Plan provides an Eligible Retiree and eligible Dependents, as those terms are defined in each Retiree Medical Plan, with welfare benefits pursuant to the terms of such Retiree Medical Plan. The requirements for eligibility under each Retiree Medical Plan, as well as how to participate in each such plan, is set forth in the applicable SPD and/or Benefit booklet for each Retiree Medical Plan. The Plan Administrator will notify Retirees of their eligibility to participate and furnish copies of the SPD and Benefits booklet applicable the Retiree Medical Plan for which an Eligible Retiree is eligible to participate.

B. **Participation.** An Eligible Retiree and his or her eligible Dependents will become participants in each Retiree Medical Plan as set forth in the applicable SPD and/or Benefit Booklet for such Retiree Medical Plan

C. **Termination of Participation.** An individual's participation in the Plan will terminate as of the first of the following to occur:

1. The date the individual ceases to make required contributions toward the cost of the Retiree Medical Plan;

2. The date the Plan is terminated;

3. With respect to any Dependent, the date such person ceases to be a Dependent (under each of the Plan and the applicable Retiree Medical Plan);

4. With respect to a COBRA participant of a Retiree Medical Plan, the date the individual's COBRA continuation eligibility terminates; or

5. With respect to any specific Retiree Medical Plan, the date the Retiree ceases to be an Eligible Retiree, or the date such Retiree Medical Plan is terminated.

**Part 4**
**Summary of Plan Benefits**

The Plan provides an Eligible Retiree, his/her Spouse and covered Dependents with welfare benefits pursuant to the terms of each Retiree Medical Plan. A summary of the Benefits provided under each Retiree Medical Plan is set forth in the applicable SPD and/or Benefit booklet. The Plan will provide benefits in accordance with the applicable requirements of Federal laws.

## Part 5
## Claiming Benefits

A. **Claims for Fully-Insured Benefits**. For purposes of determination of the amount of, and entitlement to, Benefits of a Retiree Medical Plan provided under insurance or other contracts, the respective insurer is the named fiduciary under the Plan, with full power to interpret and apply the terms of the applicable Retiree Medical Plan. To obtain Benefits under such a Retiree Medical Plan, the participant must follow the claims procedures under the applicable insurance contract, which may require the participant to complete, sign, and submit a written claim on the insurer's form. The insurance company will decide the participant's claim in accordance with its reasonable claims procedures, as required by ERISA. The insurance company has the right to secure independent medical advice and to require such other evidence as it deems necessary in order to decide a claim. If the insurance company denies a claim in whole or in part, then the participant will receive a written notification setting forth the reasons for the denial. The participant may appeal the denial to the insurance company for review, and the insurance company will decide the appeal in accordance with reasonable appeals procedures, as required by ERISA. If the participant does not appeal on time, then he will lose his or her right to file suit in a state or federal court, as he or she would not have exhausted his internal administrative appeal rights (which generally is a prerequisite to bringing a suit in state or federal court). The applicable SPD and/or Benefit booklet provides more information about how to file a claim and details regarding the insurance company's claims and appeals procedures. Where a Benefit provided through a fully-insured contract, the terms of that contract will govern with respect to making determinations on claims or appeals for Benefits, to the extent such terms conflict with this plan document, unless otherwise required by law.

B. **Claims for Self-Funded Benefits**. For purposes of determination of the amount of, and entitlement to, Benefits of a Retiree Medical Plan that is provided through the Company's general assets, the Plan Administrator is the named fiduciary under the Plan, with full power to interpret and apply the terms of the applicable Retiree Medical Plan. To obtain Benefits under such a Retiree Medical Plan, the participant must follow the claims procedures under the applicable Retiree Medical Plan, which may require the participant to complete, sign, and submit a written claim. The Plan Administrator or its designee will decide the participant's claim in accordance with its reasonable claims procedures, as required by ERISA. The Plan Administrator has the right to secure independent medical advice and to require such other evidence as it deems necessary in order to decide a claim. If a claim is denied in whole or in part, then the participant will receive a written notification setting forth the reasons for the denial. The participant may appeal the denial to the Plan Administrator for review, and the Plan Administrator or its designee will decide the appeal in accordance with reasonable appeals procedures, as required by ERISA. If the participant does not appeal on time, then he will lose his or her right to file suit in a state or federal court, as he or she would not have exhausted his internal administrative appeal rights (which generally is a prerequisite to bringing a suit in state or federal court). The applicable SPD and/or Benefit booklet provides more information about how to file a claim and details regarding the claims and appeals procedures for each applicable Retiree Medical Plan.

## Part 6
## Plan Administration and Amendment

A. **Plan Administrator**. The Plan Administrator of the Plan is the Gerdau Ameristeel Benefit Plans Administrative Committee. The administration of the Plan shall be under the supervision of the Plan Administrator. It shall be a principal duty of the Plan Administrator to see that the Plan is carried out, in accordance with its terms, for the exclusive benefit of persons entitled to participate in the Plan without discrimination among them. The Plan Administrator shall have full power and discretion to administer the Plan in all of its details, subject to applicable requirements of law. For this purpose, the Plan Administrator's powers shall include, but shall not be limited to, the following authority, in addition to all other powers provided by this Plan:

1. to make and enforce such rules and regulations as it deems necessary or proper for the efficient administration of the Plan, including the establishment of any claims procedures that may be required by applicable provisions of law;

2. to interpret the Plan, its interpretation thereof in good faith to be final and conclusive on all persons claiming Benefits under the Plan;

3. to determine all questions concerning the Plan, including the eligibility of any person to participate in the Plan and the status and rights of any Participant; provided, further, that any such determination shall be final and conclusive;

4. to compute the amount of Benefits that shall be payable to any Participant or other person in accordance with the provisions of the Plan, and to determine the person or persons to whom such Benefits shall be paid;

5. to authorize the payment of Benefits;

6. to appoint such agents, counsel, accountants, consultants and other persons as may be required to assist in administering the Plan; and

7. to allocate and delegate its responsibilities under the Plan and to designate other persons to carry out any of its responsibilities under the Plan, any such allocation, delegation or designation to be in writing.

Notwithstanding the foregoing, the Plan Administrator's authority under this Plan shall not extend to determinations for which an insurer or administrator under a Retiree Medical Plan is exclusively empowered, whether by contract or delegation.

B. **Examination of Records**. The Plan Administrator shall make available to each participant such of his records under the Plan as pertain to him, for examination at reasonable times during normal business hours.

C. **Reliance on Tables, Etc**. In administering the Plan, the Plan Administrator shall be entitled to the extent permitted by law to rely conclusively on all tables, valuations, certificates, opinions and reports which are furnished by, or in accordance with the instructions of, the administrators of the Retiree Medical Plans, or by accountants, counsel or other experts employed or engaged by the Plan Administrator.

D. **Named Fiduciary**. The Plan Administrator shall be a "named fiduciary" for purposes of Section 402(a)(1) of ERISA with authority to control and manage the operation and administration of the Plan, and shall be responsible for complying with any applicable reporting and disclosure requirements of Part 1 of Subtitle B of Title I of ERISA.

E. **Nondiscriminatory Exercise of Authority**. Whenever, in the administration of the Plan, any discretionary action by the Plan Administrator is required, the Plan Administrator shall exercise its authority in a nondiscriminatory manner so that all persons similarly situated shall receive substantially the same treatment.

F. **Amendment or Termination of the Plan**. The Company, as plan sponsor, has the right to amend or terminate the Plan at any time. In the event the Company decides to amend or terminate the Plan, such action will be taken by resolution of the Board of Directors of the Company (or other person or persons to whom the power to amend has been delegated by the Board); provided, however, changes to the SPDs and Benefit booklets will not require the prior approval of the Company's Board of Directors and shall be implemented and approved by the Company's benefits manager.

## Part 7
## Circumstances That May Affect Benefits

A. Denial or Loss of Benefits. An individual's Benefits (and the Benefits of his or her eligible family members) under each Retiree Medical Plan will cease when that individual's participation in such Retiree Medical Plan terminates. Benefits will also terminate upon termination of the Plan, or termination of participation in the Plan.

B. Other Circumstances and Recovery of Benefits. Other circumstances can result in the termination, reduction, recovery (through subrogation or reimbursement), or denial of Benefits. For example, Benefits paid may be recovered through subrogation in the case of an accident or other instance in which a third party is responsible for paying. The SPD and/or Benefit Booklet for each Retiree Medical Plan provides additional information, as applicable, with regard to such circumstances.

**Part 8**
**COBRA Continuation Coverage**

Except as outlined below, no benefits will be paid for any expense incurred after the date an individual ceases to be covered under the terms of the Plan.

COBRA continuation coverage is a continuation of certain Retiree Medical Plan coverage for Dependents when coverage would otherwise end because of a life event known as a "qualifying event" that makes a Dependent no longer eligible for coverage (such as divorce, death, or a child ceasing to meet the definition of Dependent). After a qualifying event, COBRA continuation coverage can become available to the Retiree's eligible family members for a temporary period of time. Under the Plan, qualified beneficiaries who elect COBRA continuation coverage for eligible Retiree Medical Plans must pay for COBRA continuation coverage. COBRA rights are explained in detail in the SPD and/or Benefit booklet for each Retiree Medical Plan to which COBRA applies. Additional information about rights and obligations under the Plan and under federal law can be obtained by contacting the Plan Administrator.

**Part 9**
**Adoption of Plan by Related Employers**

An Affiliate may, with the consent of the Company, adopt this Plan, including any Retiree Medical Plans for which that Affiliate's Retirees are eligible, and become an Employer by action of its Board of Directors or similar action as allowed under such Affiliate's governing documents.

By adoption of this Plan and any or all Retiree Medical Plans, each Employer agrees that only the Company will be authorized to appoint the Plan Administrator, who will perform the functions set forth in this Plan as the Plan Administrator for all participants in the Plan, including Retirees of an adopting Employer. The Company shall have the authority to amend or terminate the Plan and/or the Retiree Medical Plans without further action or consent by an adopting Employer.

**Part 10**
**Miscellaneous Information**

A. **Plan Funding.** Funding for the Benefits provided under each of the Retiree Medical Plans may be different for each Retiree Medical Plan. Benefits under a Retiree Medical Plan that is maintained pursuant to an Insurance Contract are paid solely by the applicable Insurer, in which case all Benefits shall be limited to those actually provided by the insurer under the Insurance Contract for each Retiree Medical Plan. Benefits for non-insured plans may be paid from the general assets of the Company, from a trust established to maintain contributions from Eligible Retirees and/or the Company, or a combination thereof. Other than as may be required by federal law, nothing herein shall be construed to require the Company or the Plan Administrator to maintain any fund or segregate any amount for any Benefits provided under a Retiree Medical Plan for a participant. Regardless of funding mechanism, no participant or other person shall have any claim against, right to, or security or other interest in, any fund, account or asset of the Company or any Employer from which any such payment under the Plan may be made.

B. **Assignment Of Benefits**. Generally, you cannot assign, pledge, encumber, alienate or otherwise transfer benefits payable under this Plan before you have received those benefits, except that benefits may generally be assigned to the provider for whose services you are being reimbursed.

C. **Qualified Medical Child Support Orders**. It is possible that a court might enter an order requiring the Plan to cover under a Retiree Medical Plan a participant's child who is not otherwise enrolled under this Plan. Such an order will be honored, provided it meets the applicable legal requirements for a qualified medical child support order, or "QMCSO." The Plan Administrator has established specific procedures for determining whether a support order constitutes a QMCSO. Refer to the applicable SPD and/or Benefits booklet for details on the procedure applicable to each Retiree Medical Plan.

D. **Collective Bargaining Agreements**. The Plan is not directly maintained pursuant to a collective bargaining agreement. However, certain collective bargaining agreements provide that the Retirees covered by such agreements will be eligible to participate in the Plan. A copy of any applicable collective bargaining agreement may be obtained on written request to the Plan Administrator, and/or a list of collective bargaining units with Eligible Retirees participating in the Plan is available for examination at the Company's main office.

E. **No Guarantee of Tax Consequences**. Neither the Plan Administrator nor the Company makes any commitment or guarantee that any amounts paid to or for the benefit of a Participant under the Plan shall be excludable from the Participant's gross income for federal or state income tax purposes, or that any other federal or state tax treatment shall apply to or be available to any Participant. It shall be the obligation of each Participant to determine whether each payment made to or for his benefit is excludable from gross income for federal and state income tax purposes, and to notify the Company if the Participant has reason to believe that any such payment is not so excludable.

F.     **Statement of ERISA Rights**.   As a participant in the Plan you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 ("ERISA").  ERISA provides that all plan participants will be entitled to:

1.     Receive Information About Your Plan And Benefits.

   a.     Examine, without charge, at the Plan Administrator's office and at other specified locations, such as worksites and union halls, all documents governing the Plan, including insurance contracts and collective bargaining agreements, and a copy of the latest annual report (Form 5500 Series), if any, filed by the Plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Pension and Welfare Benefit Administration.

   b.     Obtain, upon written request to the Plan Administrator, copies of documents governing the operation of the Plan, including insurance contracts and collective bargaining agreements, and copies of the latest annual report (Form 5500 Series) and updated Summary Plan Description.  The Plan Administrator may make a reasonable charge for the copies.

   c.     Receive a summary of the Plan's annual financial report, if any. The Plan Administrator is required by law to furnish each participant with a copy of the summary annual report.

2.     Continue Group Retiree Medical Plan Coverage.

   a.     Continue health care coverage for yourself, spouse or dependents if there is a loss of coverage under the Plan as a result of a qualifying event.  You or your dependents may have to pay for such coverage.  Review this Summary Plan Description and the documents governing the Plan on the rules governing your COBRA continuation coverage rights.

   b.     Reduction or elimination of exclusionary periods of coverage for preexisting conditions under your group health plan, if you have creditable coverage from another plan.  You should be provided a certificate of creditable coverage, free of charge, from your group health plan or health insurance issuer when you lose coverage under the Plan, when you become entitled to elect COBRA continuation coverage, when your COBRA continuation coverage ceases, if you request it before losing coverage, or if you request it up to 24 months after losing coverage.  Without evidence of creditable coverage, you may be subject to a preexisting condition exclusion for 12 months (18 months for late enrollees) after your enrollment date in your coverage.

3. Prudent Actions By Plan Fiduciaries. In addition to creating rights for plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate your plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other plan participants and beneficiaries. No one, including your employer, your union, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a benefit or exercising your rights under ERISA.

4. Enforce Your Rights. If your claim for a benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules. Under ERISA, there are steps you can take to enforce the above rights. For instance:

a. If you request a copy of Plan documents or the latest annual report from the Plan and do not receive them within 30 days, you may file suit in a Federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Plan Administrator.

b. If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or Federal court.

c. If you disagree with the Plan's decision or lack thereof concerning the qualified status of a domestic relations order or a medical child support order, you may file suit in Federal court.

d. If it should happen that plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a Federal court. The court will decide who should pay court costs and legal fees. If you are successful the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

5. Assistance With Your Questions. If you have any questions about your Plan, you should contact the Plan Administrator. If you have any questions about this statement or about your rights under ERISA or if you need assistance in obtaining documents from the Plan Administrator, you should contact the nearest office of the Employee Benefits Security Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquires, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

G. **Retiree Medical Plans Privacy Practice and Safeguard Requirements.**

1. Introduction. Members of the Company's workforce may have access to the individually identifiable health information of Plan Participants for administrative functions of the Plan. When this health information is provided from a Retiree Medical Plan subject to the privacy and security provisions of HIPAA (a "Regulated Plan") to the Company, it is protected health information ("PHI"). The Health Insurance Portability and Accountability Act of 1996, known as "HIPAA," and its implementing regulations restrict the Company's ability to use and disclose PHI. The Company will have access to PHI from a Regulated Plan only as permitted under this section of the Plan that deals with Plan Document Privacy Practice and Safeguard Requirements or as otherwise required or permitted by HIPAA.

2. Provision of Protected Health Information to the Company.

a. Definitions. As used in this Section, the following terms have the following meanings unless a different meaning is clearly required by the context:

(1) "Plan administration purposes" will mean administration functions performed by the Company on behalf of a Regulated Plan, such as quality assurance, claims processing, auditing, and monitoring. Plan administration functions do not include functions performed by the Company in connection with any other benefit or benefit plan of the Company, and they do not include any employment-related functions.

(2) "Summary Health Information" shall mean: information that (i) summarizes the claims history, claims expenses or type of claims experienced by individuals for whom a plan sponsor had provided health benefits under a health plan; and (ii) from which the information described at 45 CFR §164.514(b)(2)(i) has been deleted, except that the geographic information described in 45 CFR §164.514(b)(2)(i)(B) need only be aggregated to the level of a five-digit zip code.

b. Permitted Disclosure of Enrollment/Disenrollment Information. A Regulated Plan may disclose to the Company information relative to whether the individual is participating in the plan.

c. Permitted Uses and Disclosure of Summary Health Information. A Regulated Plan may disclose Summary Health Information to the Company, provided the Company requests the Summary Health Information for the purpose of (1) obtaining premium bids from health plans for providing health insurance coverage under the Plan; or (2) modifying, amending, or terminating the Regulated Plan.

     d.     Permitted and Required Uses and Disclosure of Protected Health Information for Plan Administrative Purposes.  Unless otherwise permitted by law, and subject to the conditions of disclosure described in subparagraph (2)(e) below and obtaining written certification pursuant to subparagraph (2)(f) below, a Regulated Plan may disclose PHI to the Company, provided the Company uses or discloses such PHI only for plan administration purposes.  Notwithstanding any provisions of this Plan to the contrary, in no event shall the Company be permitted to use or disclose PHI in a manner that is inconsistent with 45 CFR §164.504(f).

     e.     Conditions of Disclosure for Plan Administration Purposes.  With respect to any PHI (other than enrollment/disenrollment information and Summary Health Information, which are not subject to these restrictions) disclosed to it by the Plan, the Company will:

     (1)     not use or further disclose the PHI other than as permitted or required by the Plan or as required by law;

     (2)     ensure that any agent, including a subcontractor, to whom it provides PHI received from the Regulated Plan agrees to the same restrictions and conditions that apply to the Company with respect to PHI;

     (3)     not use or disclose the PHI for employment-related actions and decisions or in connection with any other benefit or employee benefit plan of the Company;

     (4)     report to the Plan Administrator any use or disclosure of the information, or which it becomes aware, that is inconsistent with the permitted uses or disclosures;

     (5)     make available PHI to comply with HIPAA's right to access in accordance with 45 CFR §164.524;

     (6)     make available PHI for amendment and incorporate any amendments to PHI in accordance with 45 CFR §164.526;

     (7)     make available the information required to provide an accounting of disclosures in accordance with 45 CFR §164.528;

     (8)     make its internal practices, books, and records relating to the use and disclosure of PHI received from a Regulated Plan available to the Secretary of Health and Human Services for purposes of determining compliance by the Regulated Plan with HIPAA's privacy requirements;

     (9)     if feasible, return or destroy all PHI received from a Regulated Plan that the Company still maintains in any form and retain no copies of such information when no longer needed for the purpose for which disclosure was made, except that, if such return or destruction is not

feasible, limit further uses and disclosures to those purposes that make the return or destruction of the information infeasible; and

(10) ensure that the adequate separation between the Regulated Plan and the Company (i.e., the "firewall"), required in 45 CFR §164.504(f)(2)(iii), is satisfied.

f. Adequate Separation Between the Regulated Plan and the Company.

(1) The Company will only permit certain employees designated by the Company, who are in the classes of employees set forth below, to use or disclose PHI received from the Regulated Plan (the "Designated Group"):

**Privacy Official**
**Plan Administrator**
**Human Resources**
**Benefits and Compensation Planning**
**Health and Welfare Benefits**
**Compliance**
**Retirement Plans**
**IT**
**Payroll**
**HRIS**
**Finance**
**Office of General Counsel**
**Internal Auditing**

(2) The Company will restrict the access to PHI and the use of PHI by the Designated Group to the plan administration functions that the Company performs for the Regulated Plan.

(3) The Company will provide an effective mechanism for resolving any issues of noncompliance by members of the Designated Group.

g. Reservation of Discretion. The Privacy Official for the Regulated Plan will be designated by Company. The Privacy Official has the discretionary authority to interpret and enforce the privacy rules of the Regulated Plan. Any ambiguities will be resolved in favor of a meaning that permits the Regulated Plan to comply with the HIPAA privacy and security standards. The Regulated Plan has the authority to adopt policies and procedures concerning the use and disclosure of PHI that are not inconsistent with HIPAA or the terms of the Plan (including this amendment) and to administer and interpret those policies and procedures.

       h. Certification of Plan Sponsor. The Regulated Plan shall disclose PHI to the Company only upon the receipt of a certification by the Company that the Regulated Plan has been amended to incorporate the provisions of 45 CFR §164.504(f)(2)(ii), and that the Company agrees to the conditions of disclosure set forth in subparagraph (2)(e). The Company hereby certifies that this Plan document constitutes such an amendment.

H. **Governing Law**. Except as required by Federal law, this Plan shall be construed, administered and enforced according to the laws of the State of Florida.

## Part 11
## Important Information Regarding the Plan

A. The official name of the Plan is: Gerdau Ameristeel Retiree Medical Plan.

B. The name of the plan sponsor is: Gerdau Ameristeel US Inc. A list of adopting Employers is available from the Plan Administrator upon request.

C. The Employer Identification Number ("EIN") assigned by the Internal Revenue Service ("IRS") to the plan sponsor is: 59-0792436. The plan identification number for the Plan is 511.

D. The Plan is a welfare benefit plan providing certain medical, dental, and prescription drug benefits.

E. The Plan Administrator's address is as follows:

Gerdau Ameristeel Benefit Plans Administrative Committee
C/o Benefits Director
P.O. Box 31328
Tampa, FL 33631
(800) 637-8144 – phone
(813) 207-2280 – fax

F. Trenam, Kemker, Scharf, Barkin, Frye, O'Neill and Mullis, P.A. is the agent designated for the service of legal process at the address shown below. This means that if the Plan is ever a party to a lawsuit for any reason, the legal papers may be served upon the Company at the following address:

Trenam Kemker
2700 Bank of America Plaza
101 E. Kennedy Boulevard
Tampa, FL 33602

Legal process may also be served on the Plan Administrator at the following address:

Gerdau Ameristeel Benefit Plans Administrative Committee
Gerdau Ameristeel US Inc.
4221 W. Boy Scout Boulevard, Suite 600
Tampa, FL 33607
(800) 637-8144

G. For the Retiree Medical Plans for which the HIPAA privacy and security standards apply, the HIPAA Privacy Contact/Privacy Official for filing complaints or obtaining information regarding your personal medical information is as follows:

Gerdau Ameristeel US Inc.
Benefits Director
P.O. Box 31328
Tampa, FL 33631
(800) 637-8144 – phone

# EXHIBIT A

## RETIREE MEDICAL PLANS

The Retiree Medical Plans, as used in the Plan document, are the following plans:

- Gerdau Ameristeel Retiree Medical Plan (limited to eligible Retirees of Employers)
- Co-Steel Raritan Retiree Medical Benefit Plan (limited to certain eligible former Co-Steel Raritan executives)
- Gerdau Ameristeel Retiree Medical Plan for St. Paul Union Retirees (limited to eligible St. Paul union Retirees)
- Sheffield Steel Corporation Retiree Health and Welfare Plan (limited to eligible Retirees in the Group Insurance Plan for Retired Hourly Sheffield Associates)
- Sheffield Steel Corporation Retired Salaried Health and Welfare Plan (limited to eligible retirees of Sheffield Steel Corporation)

# SHEFFIELD
# STEEL CORPORATION

## Group Insurance Plan For

## Hourly Retired Associates
## (Medicare and Non-Medicare Coverage)

## Sand Springs Division

Effective December 1, 2003

TABLE OF CONTENTS – SHEFFIELD STEEL CORPORATION - RETIREE HOURLY PLAN

FOREWORD ..... 1

SCHEDULE OF BENEFITS
MAJOR MEDICAL COVERAGE WHEN NOT ELIGIBLE FOR MEDICARE ..... 2,3
MAJOR MEDICAL COVERAGE WHEN ELIGIBLE FOR MEDICARE ..... 3

CERTIFICATION OF PLAN COVERAGE PROCEDURE ..... 4

ELIGIBILITY
EMPLOYEE COVERAGE ..... 5
DEPENDENT COVERAGE ..... 5

COVERAGE EFFECTIVE DATES
COVERAGE OF A PENSIONER OR SURVIVING SPOUSE ..... 6
COVERAGE OF A DEPENDENT ..... 6
CHANGE IN FAMILY STATUS ..... 6
QUALIFIED MEDICAL CHILD SUPPORT ORDER PROCEDURES ..... 6

COVERAGE FOR YOUR FAMILY
DEFINITION OF FAMILY ..... 8

COMPREHENSIVE MAJOR MEDICAL COST CONTAINMENT
PREFERRED PROVIDER ORGANIZATION ..... 9
PRECERTIFICATION ..... 9
CONTINUED STAY REVIEW ..... 10
MEDICAL CASE MANAGEMENT ..... 11

COMPREHENSIVE MAJOR MEDICAL COVERAGE
DEDUCTIBLE AMOUNT ..... 12
COINSURANCE AMOUNT ..... 12
MAXIMUM BENEFIT ..... 12

ELIGIBLE EXPENSES
ACCIDENTAL INJURY BENEFIT ..... 13
ALCOHOL OR SUBSTANCE DEPENDENCY ..... 13
AMBULANCE SERVICES ..... 13
AMBULATORY SURGICAL CENTER ..... 13
ANESTHESIA ..... 13
CONVALESCENT HOSPITAL/EXTENDED CARE FACILITY ..... 14
DENTAL EXPENSES (PAID AS MEDICAL) ..... 14
DIAGNOSTIC X-RAY AND LABORATORY ..... 14
DOCTOR SERVICES ..... 14
EMERGENCY ROOM – HOSPITAL CHARGES ..... 14
EMERGENCY ROOM – PHYSICIAN CHARGES ..... 15
MINOR EMERGENCY CENTER ..... 15
HOME HEALTH CARE ..... 15
HOSPICE CARE ..... 15
HOSPITAL EXPENSES ..... 15
MANIPULATIVE THERAPY (INCLUDES CHIROPRACTIC CARE) ..... 15
MASTECTOMY ..... 15
MATERNITY EXPENSES ..... 16
MEDICAL EQUIPMENT ..... 16
MENTAL/NERVOUS DISORDERS ..... 16
NURSING EXPENSES ..... 17
ORGAN, TISSUE & BONE MARROW TRANSPLANTS ..... 17
PRE-ADMISSION TESTING ..... 22
PRESCRIPTION DRUGS ..... 22
PREVENTIVE MEDICINE BENEFIT ..... 23
ROUTINE WELL-BABY IN-HOSPITAL NEWBORN CARE ..... 24
SICK BABY IN-HOSPITAL CARE ..... 24
SECOND SURGICAL OPINIONS ..... 24
SKILLED NURSING FACILITY ..... 24
SURGERY ..... 25
THERAPY EXPENSES ..... 25

COMPREHENSIVE MAJOR MEDICAL EXCEPTIONS ..... 26

GENERAL PROVISIONS
COORDINATION OF BENEFITS (COB) ..... 27
PRE-EXISTING CONDITIONS ..... 29
ESTABLISHING CREDITABLE COVERAGE ..... 29
REFUND FOR OVERPAYMENTS OF BENEFITS ..... 29
SUBROGATION/RIGHT OF REIMBURSEMENT ..... 29
BENEFITS FOR SERVICES OUTSIDE THE SATE OF OKLAHOMA ..... 30

TABLE OF CONTENTS

DEFINITIONS ..... 31

IMPACT OF MEDICARE AND GOVERNMENT PLANS ON MEDICAL CARE BENEFITS
- MEDICARE ..... 35
- BENEFITS WHILE TRAVELING OUTSIDE U.S. OR PUERTO RICO ..... 35
- GOVERNMENT PLANS ..... 35

TERMINATION, CONTINUATION, AND REINSTATEMENT OF COVERAGE
- EMPLOYEE ..... 36
- DEPENDENT ..... 36

CONTINUATION OF COVERAGE UNDER COBRA ..... 37

HOW TO FILE A CLAIM
- HOSPITAL ..... 39
- MEDICAL ..... 39
- PROOF OF LOSS ..... 39
- BENEFIT DETERMINATIONS FOR PROPERLY FILED CLAIMS ..... 39

COMPLAINT APPEAL PROCEDURE ..... 40

PLAN MODIFICATIONS AND AMENDMENT ..... 42

ERISA INFORMATION ..... 43

STATEMENT OF ERISA RIGHTS ..... 44

DISCRETIONARY AUTHORITY ..... 45



## FOREWORD

Welcome to the Medical Plan Booklet for Sheffield Steel Corporation Retired Hourly Paid Employees.

This book is intended to help you to understand the benefits which are available to you and your dependents.

There are two (2) plans covered in this book:

1. Comprehensive Major Medical Coverage When Not On Medicare (See Page 1 for the Summary). THIS PLAN IS ALSO KNOWN AS "The PPO Plan".

2. Major Medical Coverage When Eligible for Medicare (See Page 5 for the Summary). THIS PLAN IS ALSO KNOWN AS "The Medicare Supplemental Plan".



SCHEDULE OF BENEFITS FOR SHEFFIELD STEEL CORPORATION
GROUP NUMBER 9749-08 - RETIRED HOURLY PLAN

EMPLOYEES AND DEPENDENTS
COMPREHENSIVE MAJOR MEDICAL COVERAGE WHEN NOT ELIGIBLE FOR MEDICARE

Maximum While Covered Under This Plan....................$250,000

Accidental Injury Benefits ....................First $500 per occurrence paid at 100%
.................... No Deductible

Convalescent Hospital/Extended Care
Annual Maximum....................180 Days

PPO Doctors Office Visits....................$17.50 Copay

Emergency Room Facility....................$50 Copay (Unless Admitted)

Home Health Care
Annual Maximum.................... 100 Visits

Hospice Care
Maximum While Covered Under This Plan ....................$15,000

Hospital Room and Board Limit
Maximum per Day .................... Average Semi-Private Rate

*Separate Hospital per Admission Deductible* ....................$200
*(Applies to Non PPO Only)*

Manipulative Therapy
Annual Maximum (Including Xrays)....................$1,000

Mental/Nervous Disorders
In-Patient/Partial Hospitalization Annual Maximum....................30 Days
Out-Patient Annual Maximum ....................26 Visits

Paid Prescriptions
With Drug Card (34 day Supply) or Mail Order (90 day Supply)
Generic.................... $10.00 Copay
Name Brand .................... $17.50 Copay

Skilled Nursing Facility
Maximum Per Occurrence.................... 365 days

Substance Dependency (Alcohol & Drug Treatment)
Maximum While Covered (In-Patient & Out-Patient)....................$5,000



SCHEDULE OF BENEFITS

**Two different levels of benefits are being provided under this Plan:**

1. The "PPO" benefits level will be payable for services rendered by a BlueChoice PPO or BlueCard PPO Provider.
2. The "Non-PPO" benefits level will be payable for services rendered by a Non-PPO Provider.

| BENEFITS | PPO | NON-PPO |
|---|---|---|
| Calendar Year Deductible (Deductibles cross apply)<br><br>Per Individual<br>Per Family | <br><br><br>$100<br>$200 | <br><br><br>$250<br>$500 |
| Coinsurance | 90% of first $10,000 then 100% thereafter* | 60% of first $15,000 then 100% thereafter* |
| Calendar Year Out-of-Pocket Maximum<br><br>Per Individual | Excludes Deductible & Copays<br><br>$1000 | Excludes Deductible & Copays<br><br>$6,000 |
| Office Visits (for all services rendered in the doctors office or urgent care facility) | $17.50 Copay, 100%. | Deductible & Coinsurance |

***Coinsurance and Out-of-Pocket Maximums Do Not Apply to Charges for Mental/Nervous Disorders and Alcohol or Substance Dependency. The Out of Pocket Maximums cross apply.**

| BENEFITS | PPO | NON-PPO |
|---|---|---|
| Preventive Medicine Benefits | Includes: Routine Physicals, Routine Mammogram, Routine GYN Exam/Pap Smear, Routine Prostate Exams/PSA Testing, Well Child Exams, and Immunizations, Vaccinations, & Booster Shots.<br><br>All benefits are paid at 100%. See " Eligible Expenses" for details & maximums. | |

**MAJOR MEDICAL COVERAGE WHEN ELIGIBLE FOR MEDICARE**

This coverage will be furnished in the form of a Medicare Supplement Policy. These benefits will become effective on the date that you or an eligible dependent first become eligible for coverage under Medicare (for any reason)

**Except for Preventive Medicine Benefits and Prescription Drugs, this Plan will not cover services that are not approved by Medicare (unless for Emergency Treatment while out of the country).**

**Maximum While Covered Under Plan**
There is no maximum so long as covered by Medicare.

**Medicare Part-A In-Patient Hospital Deductible**
Plan will pay 50% of any Hospital Deductible required by Medicare.

**Medicare Part B Deductible**
Plan will pay 50% of the Yearly Deductible required by Medicare.

**Medicare Assigned Services (provider accepts Medicare allowable charges)**
Plan will pay 90% of the amount patient is responsible for.

SCHEDULE OF BENEFITS

**Medicare Non-Assigned Services (provider does not accept Medicare allowable charges)**
Plan will pay 90% of the amount that Medicare would have allowed for assigned services. Employee will be responsible for the difference in the billed amount and the Medicare allowed amount + the 10%.

**Paid Prescriptions**
Copays with Drug Card.............................. $15 Generic, $17.50 Name Brand
Copays with Mail Order.............................. $10 Generic, $17.50 Name Brand

**Out of Country Charges (for Emergency Treatment)**
Coverage provided at 80% (unless treatment is approved by Medicare) after a $100 deductible.

## CERTIFICATION OF PLAN COVERAGE PROCEDURE

In addition to the automatic certificate of Plan coverage sent at the time coverage ends (and at the time COBRA (Consolidated Omnibus Budget Reconciliation Act of 1985) coverage ends if applicable), covered persons may request a certificate of prior coverage from this Plan at any time within twenty four (24) months of the time coverage ceases. The certificate will be sent, within a reasonable time after such person calls or writes the Plan Administrator at P.O Box 218, Sand Springs, OK 74063, (918) 245-1335.



## ELIGIBILITY

### EMPLOYEE COVERAGE

You will be eligible to participate in the Comprehensive Major Medical Plan if you:

a) elect such coverage when you first become eligible; however, if you and/or your dependents are eligible for major medical coverage under any other employer's insurance program, you may defer electing this coverage for yourself and your dependents until the other coverage terminates, provided you notify the benefits administrator at Sand Springs, Oklahoma within 30 days of the termination of the other coverage; and

b) retire under the Company pension plan on or after September 1, 1981, on other than a deferred vested pension from a group of employees designated by the Company as covered by the Plan and at the time of retirement have 15 or more years of continuous service, or

c) are receiving a Surviving Spouse's benefit under the Company pension plan as the surviving spouse of an employee:

   1. who retires under the Company pension plan on or after September 1, 1981, on other than a deferred vested pension from a group of employees designated by the Company as covered by the Plan, and dies thereafter, or
   2. who dies on or after September 1, 1981 at a time when the employee is accruing continuous service in a group of employees designated by the Company as covered by the Plan;

d) authorize deduction of premiums for such coverage from your pension or Surviving Spouse's benefit, or in the event your pension or benefit is insufficient to cover the premium, send a check or money order payable to Sheffield Steel Corp. each quarter in an amount equal to three times the monthly cost applicable to you; such payment is to be mailed to the local benefits administrator at the location from which you or your spouse retired and must be received not lager than the 10th day of the calendar quarter for which payment is due (i.e., May 10, August 10, November 10, February 10).

provided, however, that you

a) are not insured under any other group insurance plan or program providing hospital and medical coverage, including a prepaid group practice plan or Health Maintenance Organization (HMO), toward the cost of which the Company contributes; and

b) are a legal resident of the United States or Puerto Rico.

### DEPENDENT COVERAGE

Each employee who becomes eligible for employee coverage shall become eligible for dependent coverage on the date the employee becomes eligible for employee coverage.

a) Newborn children to a covered employee will be covered from the moment of birth for injury or illness, including the necessary care or treatment of medically diagnosed congenital defects, birth abnormalities or prematurity provided the child is properly enrolled in the Plan within thirty-one (31) days of birth. This provision shall not apply nor in any way affect the normal maternity provisions applicable to the mother.

b) A spouse will be considered an eligible dependent from the date of marriage, provided the spouse is properly enrolled as a dependent of the Employee within 31 days of the date of marriage.

c) If a dependent is acquired, other than at the time of his/her birth, due to court order, decree, or marriage, that dependent will be considered an eligible dependent from the date of such court order, decree or marriage, provided the dependent is properly enrolled within 31 days of such court order, decree, or marriage.

## COVERAGE EFFECTIVE DATES

You will become enrolled in the Plan at the time you first become eligible.

Coverage of a pensioner or surviving spouse will become effective on the latest of:

a) September 1, 1981; or
b) If you are a pensioner, the first day of the month in which you commence to receive a pension under the Company pension plan; or
c) If you are surviving spouse, the first day of the month following the month in which:
    1) Your spouse died, provided you make application for a Surviving Spouse's benefit within 90 days of the date of death of your spouse.

Coverage of a dependent will become effective on the later of:

a) The date your coverage becomes effective, or
b) The date you acquire such dependent.
c) Coverage for legally adopted children, other than adopted newborn children, will begin on the date of placement in the residence of the covered employee provided that the Plan Administrator has received the completed enrollment application before or within 31 days after the date the child was placed. Coverage for adopted newborn children will begin the earlier of:

    1) the moment of birth, provided that a written agreement to adopt such child has been entered into by the covered employee prior to the birth of the child and the Plan Administrator has received the completed enrollment application before or within 31 days of the date of the birth of the child; or

    2) the date the adopted newborn child is placed in the residence of the covered employee provided that the Plan Administrator has received the completed enrollment form before or within 31 days after the date the child was placed.

There will be no coverage for the newborn under this Plan if the newborn is not ultimately placed in the residence of the covered employee.

For all children covered as adopted children, if the final Decree of Adoption is not issued, coverage shall not be continued for the proposed adopted child under this Plan. It is the responsibility of the covered employee to notify the Plan Administrator if the adoption does not take place. Proof of adoption may be required by the Plan Administrator.

If you have eligible dependents, you will be enrolled for dependent coverage. However, should you and your spouse both be eligible for coverage under this Plan or any other Plan toward the cost of which the Company contributes, each will be enrolled under the respective Plan unless both choose to be covered by the other Plan. In any event, any dependent children will be enrolled under the husband's coverage unless you and your spouse elect otherwise. Such an election may not be revoked within the first 12 calendar months following the month in which the election is made. In the event coverage of either you or your spouse is terminated, that individual and that individual's eligible dependents will be enrolled as dependents of the covered person.

### Change in Family Status

Prompt written notice of any change in your family status, such as marriage or divorce, birth of a child, marriage of any of your dependent children, or death of any dependent, should be sent to your benefits administrator at Sand Springs, Oklahoma. When sending such notice be sure to include your full name and social security number.

If you are a pensioner enrolled for personal coverage only and thereafter marry or otherwise acquire a dependent, dependent coverage will become effective on the date you acquire the dependent, if you notify your local benefits administrator at the location from which you retired, promptly. If you do not notify the administrator within 30 days after the date you acquire the dependent, you may be required to submit proof of such date.

## QUALIFIED MEDICAL CHILD SUPPORT ORDER PROCEDURES

All rights and benefits, including elections, provided to a participant in this Plan shall be subject to the rights afforded to any "Alternate Recipient" under a "Qualified Medical Child Support Order." For purposes of this section, "Alternate Recipient," and "Medical Child Support Order" shall have the meanings set forth under ERISA section 609(a). In the case of any Medical Child Support Order ("MCSO") received by the Plan, its status under ERISA and the Internal Revenue Code shall be determined under the following procedures:

## COVERAGE EFFECTIVE DATES

Promptly upon receiving an MCSO, the Plan Administrator will: (a) refer the MCSO, issued by the state court of jurisdiction, to the Plan's legal counsel to render an opinion within sixty days (or such earlier period as shall be prescribed by treasury regulations) as to whether the MCSO is a "Qualified Medical Child Support Order" as defined by section 609(a)(2)(A) of ERISA, and (b) notify the concerned participant and any Alternate Recipient or other person specified in the MCSO as eligible to receive benefits under the Plan of the receipt by the Plan of the MCSO and of this procedure.

Promptly upon receiving a determination made by the Plan's legal counsel as to the status of the MCSO, the concerned participant and each Alternate Recipient (or any representative designated by an Alternate Recipient by written notice to the administrator) shall be furnished a copy of such determination. The notice of determination shall state that the administrator will commence any payments due under the Plan to the person or persons entitled thereto, depending on the determination of the Plan's legal counsel as to the "qualified" status of the MCSO, after the expiration of a sixty days commencing on the date of the mailing of the notice unless prior thereto the administrator receives notice of the institution of legal proceedings disputing the determination. The administrator shall, as soon as practical after such sixty day period ascertain the dollar amount currently payable to each payee pursuant to the Plan and MCSO and, if the MCSO is "qualified," disburse any such amounts.

If there is a dispute as to the "qualified" status of a MCSO, there shall be a delay in making payments of the amounts currently due to the payees. In that event, the administrator shall direct that the amounts payable be held in a separate account within the Plan. If within eighteen months after the deferral the MCSO is determined not to be a valid "qualified medical child support order," or the status of the MCSO has not been finally determined, amounts held in the Plan shall be paid to the person or persons who would have been entitled to such amounts if there had been no MCSO. Any determination thereafter that the MCSO is a "qualified medical child support order" shall be applied prospectively only.



## COVERAGE FOR YOUR FAMILY

### DEFINITION OF FAMILY

Eligible Dependent will Include:

a) The employees lawful spouse, provided such spouse is not legally separated or divorced from the employee, or
b) Covered employees natural or adopted child (including children placed with the employee for the purpose of an adoption), or step child or foster child living in a regular parent-child relationship with the employee, who,
   1) Is unmarried;
   2) Resides with the covered employee; and
   3) Receives over half of his or her support from the covered employee; and is either
      a) Under nineteen (19) years of age; or
      b) A full-time student at an accredited secondary school, college or university who has not attained age 25
c) The covered employee's child who is considered to be an " Alternate Recipient" under the terms of a Qualified Medical Child Support Order that has been delivered to the Plan Administrator within 31 days of the date it is issued, subject to the terms of this Plan
d) Your Dependent who has coverage in force under the Plan, who has reached the limiting age for Dependents but who cannot earn his own living due to mental or physical handicap, and is chiefly dependent upon the person covered for support and maintenance. You must furnish the Claims Administrator with proof of the child's incapacity and dependency within 31 days after the date the limiting age is reached. The Claims Administrator may also require proof of continuing incapacity and dependency. If proof is not given within 60 days of a request, coverage for the Dependent will end 60 days after the request is made.

* The requirement for the dependent child to be living in the employee's home will be waived for full-time students and in those instances when the employee is required by order of the court to provide coverage for the dependent child although the child may reside elsewhere.

**Eligible Dependent will not include a child or spouse who:**

a) is covered under any other group insurance plan or program providing hospital and medical coverage, including a prepaid group practice plan or Health Maintenance Organization, toward the cost of which the Company contributes;
b) is covered as a pensioner of Surviving Spouse under the Plan;
c) resides outside the United States or Puerto Rico; or
d) is a dependent of an employee who retires on or after July 31, 1982 and who was a part-time participant as defined in the pension agreement under which he or she retired.



COMPREHENSIVE MAJOR MEDICAL COST CONTAINMENT FEATURES

Soaring increases in health care costs are a problem that can no longer be ignored. To help control costs without sacrificing quality care your plan contains the following features for objective review of proposed medical treatment. **These provisions DO NOT APPLY if this Plan is Secondary to Medicare Coverage.**

PREFERRED PROVIDER ORGANIZATION (PPO)

**THIS PLAN ENCOURAGES YOU TO UTILIZE BLUECHOICE PPO AND BLUECARD PPO PROVIDERS WHENEVER POSSIBLE. USING A PPO PROVIDER COULD MEAN A SAVINGS TO YOU FOR THE AMOUNT THAT THE PROVIDER HAS AGREED TO WRITE-OFF OF THEIR CHARGES.**

This Plan utilizes **BlueChoice PPO Providers (in Oklahoma) and BlueCard PPO Providers (outside Oklahoma)** as Preferred Provider Networks.

**BlueChoice PPO and BlueCard PPO Providers** are a group of hospitals, physicians and other healthcare providers that have agreed to accept set fees for providing your medical needs IF YOU CHOOSE to use them. In return, your healthcare plan will pay these preferred providers a larger percentage of your healthcare bill.

**BlueChoice PPO and BlueCard PPO Providers** are not insurance companies or insurance claims payers. Your coverage is still provided through your employer and your claims are paid by the Claims Administrator.

**PRECERTIFICATION**

YOU ARE REQUIRED TO HAVE EACH HOSPITAL ADMISSION APPROVED IN ADVANCE, including authorized length of stay, in order to receive full benefits. Hospital admissions are approved by **the Claims Administrator**. This procedure applies to you and each covered dependent for all hospital admissions, including emergency admissions (non-scheduled, due to accidental bodily injury, or due to sudden onset of serious illness) even though the admission cannot be approved by **the Claims Administrator** in advance. **The Claims Administrator** must be notified within 48 hours of an emergency admission.

**If you use an Oklahoma BlueChoice PPO Provider for your services, your Provider will automatically request Precertification for you. For services rendered outside the state of Oklahoma, or from a Non-PPO Provider, you are responsible for obtaining Precertification from the Claims Administrator.**

**Precertification Requests Involving Non-Urgent Care**

Except in the case of a Precertification Request Involving Urgent Care (see below), the Claims Administrator will provide a written response to your Precertification request no later than 15 days following the date they receive your request. This period may be extended one time for up to 15 additional days, if the claims administrator determines that additional time is necessary due to matters beyond its control.

If the Claims Administrator determines that additional time is necessary, you will be notified, in writing, prior to the expiration of the original 15-day period, that the extension is necessary, along with an explanation of the circumstances requiring the extension of time and the date by which the claims administrator expects to make the determination.

If an extension of time is necessary due to the claims administrator's need for additional information, you will be notified of the specific information needed, and you will have 45 days from receipt of the notice to provide the additional information. The Claims Administrator will provide a written response to your request for Precertification within 15 days following receipt of the additional information.

The procedure for appealing an adverse Precertification determination is set forth in the section entitled, "*Complaint/Appeal Procedure*."

**Precertification Requests Involving Urgent Care**

A "Precertification Request Involving Urgent Care" is any request for medical care or treatment with respect to which the application of the time periods for making non-urgent care determinations:

- could seriously jeopardize the life or health of the covered person or the ability of the covered person to regain maximum function; or
- in the opinion of a physician with knowledge of the covered person's medical condition, would subject the covered person to severe pain that cannot be adequately managed without the care or treatment that is the subject of the Precertification request.

In case of a "Precertification Request Involving Urgent Care," the Claims Administrator will respond to you no later than 72 hours after receipt of the request, unless you fail to provide sufficient information to determine whether, or to what extent, benefits are covered or payable under the plan. In the case of such a failure, the Claims Administrator will notify you no later than 24 hours after receipt of your request, of the specific information necessary to complete your Precertification request. You will be given a minimum of 48 hours to provide the specified information. You will be notified of the Claims Administrator's response to your Precertification request no later than 48 hours after the earlier of:

- the Claims Administrator's receipt of the specified information; or
- the end of the 48-hour period you were given to provide the specified information.

NOTE: The Claims Administrator's response to your Precertification Request Involving Urgent Care, including an adverse determination, if applicable, may be issued orally. A written notice will also be provided within three days following the oral notification.

**Precertification Requests Involving Emergency Care**

If you are admitted to the hospital for emergency care and there is not time to obtain Precertification, *you or your provider should notify the Claims Administrator within 48 hours following your emergency admission.*

If you or your dependents are confined in a hospital at the time coverage begins, you must pre-certify the hospital stay within forty-eight (48) hours of when your coverage begins to avoid a Precertification penalty.

The provisions of this section do not apply to maternity and newborn benefits with regard to length of stay not in excess of forty-eight (48) hours following a normal vaginal delivery or ninety-six (96) hours following a cesarean section.

**FOR PRE-CERTIFICATION, call the following toll free number:**
**1-800-672-2378**

**FAILURE OF YOU OR YOUR PHYSICIAN TO FOLLOW THE REQUIRED PROCEDURES FOR APPROVED HOSPITAL ADMISSIONS WILL RESULT IN LESSER BENEFITS UNDER THE GROUP PLAN, AS OUTLINED BELOW:**

**Non-Certified Hospital Admissions When Not Using BlueChoice Providers:**

**Hospital Benefits Will Be Reduced by 20%. The reduction amount will not apply to the Out-of-Pocket or 100% Coinsurance Maximum and will be the responsibility of the Covered Person**

**CONTINUED STAY REVIEW**

**The Claims Administrator** will indicate in its initial approval of a hospital admission the number of days authorized for the length of stay. In the event of a medical necessity for your stay of more than the initial days authorized, the Claims Administrator will review the extended stay. In order for you to continue to be entitled to the higher plan benefits, **the Claims Administrator** must authorize additional days that are medically necessary. *No benefits will be paid for room and board charges for days that are not authorized.*

**NOTE:** *Before the Claims Administrator denies any Hospitalization or Continued Stay Review, the file will be reviewed by a physician advisor. The physician advisor will attempt to contact the attending physician (your doctor) before a final decision is made; however if your physician fails to respond to the physician advisor, a denial will be issued. A denial may also be issued if the physician advisor determines that there is not enough information to support the necessity of the procedure.*

*If the Claims Administrator denies Hospital Precertification or a Continued Stay Review, you or your physician do have the right of an appeal. For any denial, a letter is sent out to the provider and the patient from the Claims Administrator advising of the reason of the denial. The letter will also state the procedures to follow in order to appeal this decision.*

*The appeal will be assigned to another physician advisor (not the one who rendered the original recommendation) for review. After the attending physician provides any relevant additional information to support the necessity of the procedure, the physician advisor will review the file and either*

*a) overturn the original non-certification recommendation; or*
*b) uphold the original non-certification recommendation.*



COMPREHENSIVE MAJOR MEDICAL COST CONTAINMENT FEATURES

*Both the patient and the attending physician will be advised of the final decision. An appeal will not be pursued for failure of you or your physician to furnish the Claims Administrator with any requested information.*

## MEDICAL CASE MANAGEMENT

Early identification and intervention with case management can reduce health care costs, enhance quality of care and improve patient satisfaction. The Claims Administrator manages many types of cases that are identified through the various phases of the utilization review process. Cases are also identified through the concurrent review process, employers, patients, their families, or the Claims Administrator.

Case Management can provide alternative treatment plans for cases involving extensive inpatient or outpatient charges due to catastrophic injury or illness.

The case analyst/case manager, working with the patient, the patient's family, attending physician and other health care professionals and providers, will make appropriate recommendations or treatment options and care settings. The patient's best interest is the primary concern of the Case Management Program. The patient, the patient's family, and the health care team all work together from the initial point of agreement.

Referrals to Medical Case Management should include, but are not limited to, patients with conditions such as:

- Organ Transplant
- Spinal Cord Injury
- Head Injury
- Severe Burns
- Stroke
- Multiple Fractures
- Amputations
- Cancer
- Mental/Nervous
- AIDS
- Chronic Infections
- Blood Disorders
- Terminal Illness
- Lung Diseases

Medical Case Management may also be able to assist patients with the following special services:

- Medical Equipment
- Hospital Bed
- Home Health Care
- Skilled Nursing
- Home IV Therapy
- Physical Therapy
- Home Oxygen Therapy
- Wheelchairs
- Home Respiratory Therapy
- Blood Products
- Phototherapy
- Occupational and Speech Therapy

**FOR MEDICAL CASE MANAGEMENT, call the following toll free number: 1-800-672-2378**

## COMPREHENSIVE MAJOR MEDICAL COVERAGE

Comprehensive Major Medical Coverage is designed to assist you with the payment of your hospital/medical bills. It does not pay the total cost of hospital/medical services and supplies. In effect, the Plan shares with you the payment of your hospital/medical bills. The Comprehensive Major Medical Plan covers only those expenses which are considered reasonable and customary for the service provided in the area where the expenses are incurred. **These provisions DO NOT APPLY if this Plan is Secondary to Medicare**

### DEDUCTIBLE AMOUNT

You pay the first $100 Individual/$200 Family (PPO) or $250 Individual/$500 Family (Non PPO) on all Covered Expenses, unless otherwise specified, in any one calendar year. Copays will not count toward the deductible.

The $100 Individual/$200 Family deductible (PPO) or $250 Individual/$500 Family deductible (Non PPO) is paid only once in any one calendar year per covered person or covered family. The Individual deductible is paid only once if two or more family members incur expenses as a result of the same accident.

So that you will not have to pay the deductible twice in a short period for the same person, any expenses applied against one calendar year deductible incurred in the last three months of a calendar year may also be applied against the deductible for the next calendar year.

### COINSURANCE AMOUNT

After Covered Expenses reach the applicable deductible amount during a calendar year, this Plan pays a percentage of Covered Expenses as shown in the Schedule of Benefits until the maximum out-of-pocket amount shown is reached. The Plan pays 100% thereafter to the maximum benefits while covered under the Plan. The 100% coinsurance provision does not apply to covered expenses incurred for Mental/Nervous Disorders and Alcohol or Substance Dependency.

### MAXIMUM BENEFIT

This Plan will cover as a Maximum Benefit, up to $250,000 of eligible expenses, so long as the person is covered under the Plan. This includes a $5,000 special maximum benefit while covered under this Plan for all eligible expenses for treatment of Alcohol or Substance Dependency.

ELIGIBLE EXPENSES

***All eligible expenses** listed below are subject to the regular deductible and coinsurance amount as shown in the Schedule of Benefits, unless otherwise specified. **Unless otherwise specified in the plan, these provisions DO NOT APPLY if this Plan is Secondary to Medicare.***

**NON-PPO charges will be paid at the PPO deductible and benefit level for "Emergencies" as defined by the Plan.**

**All other NON-PPO charges will be paid at the Non-PPO deductible and benefits level for medically necessary treatment. However, if you are located in an area where there are no PPO Provider available that can provide the necessary services to you, benefits will be paid at the PPO deductible and benefit level.**

**ACCIDENTAL INJURY BENEFIT**

The first $500 of eligible expenses (per occurrence) for treatment within 90 days of an injury resulting from an accident, will be paid at 100%. Deductible will not apply. After the accidental injury benefit is exhausted, the deductible will apply and benefits will be processed as:

PPO 90% Non PPO 60%

**ALCOHOL OR SUBSTANCE DEPENDENCY**

**In-Patient/Partial Hospitalization**
Allowable Charges. **After Deductible**:

PPO 90% Non PPO 60%

**Out-Patient**
Allowable Charges.

| PPO | Non PPO |
|---|---|
| $17.50 Copay 100% | Deductible 60% |

All charges are subject to a $5,000 maximum while covered under this Plan for the treatment of Alcohol or Substance Dependency. When the $5,000 in benefits for treatment under this provision have been paid for a covered person, all Plan coverage for treatment of Alcohol or Substance Dependency will terminate. Charges for treatment of In-Patient and Out-Patient services do not accumulate toward the 100% Out of Pocket Maximum.

**AMBULANCE SERVICES**

Allowable Charges for professional ambulance service to the nearest facility qualified to treat an illness or injury. **After Deductible**:

PPO 90% Non PPO 90%

**AMBULATORY SURGICAL CENTER**

Allowable Charges when used in connection with a covered surgical procedure. **After Deductible**:

PPO 90% Non PPO 60%

**ANESTHESIA**

Allowable Charges for anesthetics and their administration. If anesthesia is administered by the surgeon, the charge is considered as part of the surgical fee. **After Deductible:**

PPO 90% Non PPO 60%

ELIGIBLE EXPENSES

## CONVALESCENT HOSPITAL/EXTENDED CARE FACILITY

Allowable Charges for expenses incurred in a Convalescent Hospital/Extended Care Facility for a period not in excess of 180 days. A new maximum benefit period will commence only when there has been a lapse of at least 90 days between the date of last discharge from a Convalescent Hospital/Extended Care Facility and the date of the next admission, due to the same or related causes, whether or not benefits were provided for the prior admission. **After Deductible:**

PPO 90% Non PPO 60%

## DENTAL EXPENSES (PAID AS MEDICAL)

Allowable Charges for dental services rendered by a doctor, dentist or oral surgeon for treatment of:

- Expenses incurred within twelve (12) months for accidental injuries to sound natural teeth
- The excision of wisdom teeth
- The excision of teeth not completely erupted
- The excision of a tooth root without the extraction of the entire tooth
- Closed or open reduction of a fracture or dislocation of the jaw
- Incision or excision procedures on the gums or tissues of the mouth when not performed in connection with tooth repair or extraction

If services are rendered in the office:

$17.50 Copay 100%

In-Patient and Out-Patient hospital treatment will be covered if deemed medically necessary to safeguard the health of the patient.

## DIAGNOSTIC X-RAY AND LABORATORY

Allowable Charges. Includes radiation treatment, chemotherapy and radioisotope therapy. **After Deductible:**

PPO 90% Non PPO 60%

## DOCTOR SERVICES

Allowable Charges for services rendered by someone other than a doctor who lives in your home or who is a member of your immediate family (patient's spouse, child, brother, sister, parent or parent of patient's spouse).

Excludes charges for Mental/Nervous Disorders, Alcohol or Substance Dependency, Manipulative Therapy, Maternity Expenses and Preventive Care which all have their own benefits

.

**Office Visits (includes all services billed in the doctors office):**

| PPO | Non PPO |
|---|---|
| $17.50 Copay 100% | Deductible & 60% |

**In-Patient/Out-Patient Surgery & In-Hospital Medical Care:**
Allowable Charges. **After Deductible:**

PPO 90% Non PPO 60%

## EMERGENCY ROOM - HOSPITAL CHARGES

Allowable Charges after a $50 Copayment. The copayment will not apply if you are admitted to the hospital from the Emergency Room. **After Deductible:**

PPO 90% Non PPO 60%



ELIGIBLE EXPENSES

## EMERGENCY ROOM – PHYSICIAN CHARGES

Allowable Charges. **After Deductible:**

PPO 90% Non PPO **60%**

## MINOR EMERGENCY CENTER

Allowable Charges for all services rendered in the minor emergency center.

| PPO | Non PPO |
| --- | --- |
| $17.50 Copay 100% | Deductible & 60% |

## HOME HEALTH CARE

Allowable Charges by an approved Home Health Care Agency for up to 100 visits per calendar year. Precertification should be obtained from the Claims Administrator. *No benefits will be paid for Custodial Care.* For covered expenses refer to DEFINITIONS. **After Deductible:**

PPO 90% Non PPO 60%

## HOSPICE CARE

Allowable Charges for a formal Hospice Program directed by a physician to help care for a terminally ill covered person and members of his family, up to a maximum of $15,000. A "Terminally Ill Person" is a covered employee or dependent whose life expectancy is six (6) months or less as certified by the attending physician. **After Deductible:**

PPO 90% Non PPO 60%

## HOSPITAL EXPENSES

Room and Board charges

- Average semi-private rate charged by the hospital in which the patient is confined.
- Intensive Care, Cardiac Care and Isolation Care.
- The private room rate if the facility in which the patient is confined contains no semi-private rooms.

Miscellaneous Services

All other medically necessary miscellaneous services and supplies furnished by a hospital during covered in-patient confinement (excluding private duty nursing care); and for covered outpatient treatment. **After Deductible:**

PPO 90% Non PPO 60%

***Non-PPO Hospital Deductible***: *There will be a separate $200 deductible which you are responsible for if you are confined in a Non-PPO hospital for other than an emergency admission. This deductible is not part of your Major Medical Deductible.*

## MANIPULATIVE THERAPY (INCLUDES CHIROPRACTIC CARE)

Allowable Charges up to a maximum of $1000 per calendar year. X-rays will be included in this maximum. See DEFINITIONS. **After Deductible:**

PPO 90% Non PPO 60%

## MASTECTOMY

Allowable Charges for the following expenses incurred in connection with a mastectomy. **After Deductible:**

a) reconstruction of the breast on which the mastectomy was performed;
b) surgery and reconstruction of the other breast to produce a symmetrical appearance; and
c) prostheses and physical complications in all stages of mastectomy, including lymphedemas.

in a manner determined in consultation with the attending physician and the patient.

ELIGIBLE EXPENSES

Provided that this Plan is consistent with the Women's Health and Cancer Rights Act of 1998, this benefit will not pay for expenses excluded by any general limitation or provision set forth in this Plan.

PPO **90%** Non PPO 60%

*Please Note: This information is intended to satisfy the annual notice requirement of the Women's Health and Cancer Rights Act of 1998.*

**MATERNITY EXPENSES**

Allowable Charges for all expenses for any covered employee or covered spouse. **After Deductible**:

PPO 90% Non PPO 60%

Group health plans and health insurance issuers generally may not, under Federal law, restrict benefits for any hospital length of stay in connection with childbirth for the mother or newborn child to less than 48 hours following a vaginal delivery, or less than 96 hours following a cesarean section. However, Federal law generally does not prohibit the mother's or newborn's attending provider, after consulting with the mother, from discharging the mother or her newborn earlier than 48 hours (or 96 hours as applicable). In any case, plans and issuers may not, under Federal law, require that a provider obtain authorization from the plan or issuer for prescribing a length of stay not in excess of 48 hours (or 96 hours).

**MEDICAL EQUIPMENT**

Allowable Charges for the following:

- Orthopedic and prosthetic devices (excluding dental appliances) medically necessary for the alleviation or correction of conditions arising out of accidental bodily injury or illness, or surgery; artificial eyes; casts, splints or crutches; trusses or braces; and replacement of the devices listed above if due to:
  - ◊ progression of a sickness or injury; or
  - ◊ growth of a covered child
- Oxygen and rental of equipment for its administration; kidney dialysis equipment that is not payable under Medicare;
- Colostomy bags; ileostomy supplies; catheters; cervical collar, head halter or other traction apparatus; glucometers; dextrometers; dextrostix; rental of infusion pumps; initial post-mastectomy breast prosthesis and two (2) holding bras per year;
- Rental or purchase of a wheelchair, hospital type bed, or other durable medical equipment which meets all of the following tests:
  - ◊ Can withstand repeated use;
  - ◊ Is mainly used for a medical purpose;
  - ◊ Is not useful except to treat Sickness or Injury;
  - ◊ Is essential for a person's treatment plan that is medically reviewed on a regular basis.

This equipment will be paid for on a rental basis during the time benefits are payable, unless the Claims Administrator decides to purchase the equipment. In the event that the equipment is purchased, the Covered Charge is limited to the purchase price and the cost of installation. **After Deductible**:

PPO 90% Non PPO 60%

**MENTAL/NERVOUS DISORDERS**

**In-Patient/Partial Hospitalization**

Allowable Charges up to 30 days per calendar year. **After Deductible**:

PPO **90%** Non PPO 60%

**Out-Patient**

Allowable Charges incurred for psychotherapy rendered by a licensed provider for out-of-hospital treatment up to 26 visits per calendar year.

| PPO | Non PPO |
|---|---|
| $17.50 Copay 100% | Deductible & 60% |

*Note: Charges for treatment of In-Patient and Out-Patient services do not accumulate toward the 100% Out-of-Pocket Maximum.*

ELIGIBLE EXPENSES

NURSING EXPENSES

Services of a registered nurse (R.N.), licensed practical nurse (L.P.N.) or licensed vocational nurse (L.V.N.) authorized by a doctor, other than a nurse who lives in your home or who is a member of your immediate family. **After Deductible**:

PPO 90% Non PPO **60%**

ORGAN, TISSUE & BONE MARROW TRANSPLANTS

**All transplants are subject to Precertification and must be performed in and by a Provider that meets the criteria established by the Plan for assessing and selecting Providers for transplants.**

**Precertification must be obtained at the time the covered person is referred for a transplant consultation and/or evaluation. It is the Covered Person's responsibility to make sure Precertification is obtained. Failure to obtain Precertification will result in denial of Benefits. The Plan has the sole and final authority for approving or declining requests for Precertification.**

- **DEFINITIONS**

  In addition to the definitions listed under the Definitions section of this Plan, the following definitions shall apply and/or have special meaning for the purpose of this section:

  - **Bone Marrow Transplant**

    A medical and/or surgical procedure comprised of several steps or stages including:

    - the harvest of stem cells or progenitor cells, whether from the bone marrow or from the blood, from a third-party donor (allogeneic transplant) or from the patient (autologous transplant);
    - processing and/or storage of the stem cells or progenitor cells after harvesting;
    - the administration of High-Dose Chemotherapy and/or High-Dose Radiation Therapy, when this step is prescribed by the treating Physician;
    - the infusion of the harvested stem cells or progenitor cells; and
    - hospitalization, observation and management of reasonably anticipated complications such as graft versus host disease, infections, bleeding, organ or system toxicities and low blood counts.

    The above definition of autologous Bone Marrow Transplant specifically includes transplants wherein the transplant component is derived from circulating blood in lieu of, or in addition to, harvested directly from the bone marrow, a procedure commonly known as peripheral stem cell or progenitor cell transplant or rescue procedure. This definition further specifically includes all component parts of the procedure including, without limitation, the High-Dose Chemotherapy and/or High-Dose Radiation Therapy.

  - **High-Dose Chemotherapy**

    A form of Chemotherapy wherein the dose exceeds standard doses of Chemotherapy to the extent that virtually all patients who receive High-Dose Chemotherapy sustain destruction of the bone marrow to the point that bone marrow or peripheral stem cells or progenitor cells must be implanted or infused to keep the patient alive.

  - **High-Dose Radiation Therapy**

    A form of Radiation Therapy wherein the dose exceeds standard doses of Radiation Therapy resulting in destruction of the bone marrow to the point that bone marrow or peripheral stem cells or progenitor cells must be implanted or infused to keep the patient alive.

– Precertification

Certification from the Plan that, based upon the information submitted by the covered person's attending Physician, Benefits will be provided under the Plan. Precertification is subject to all conditions, exclusions and limitations of the Plan. Precertification does not guarantee that all care and services a covered person receives are eligible for Benefits under the Plan.

– Procurement Services

The services provided to search for and match the human organ, tissue, bone marrow, peripheral stem cells, or progenitor cells donated to the transplant recipient, surgically remove the organ, tissue, bone marrow, peripheral stem cells, or progenitor cells from the donor and transport the organ, tissue, bone marrow, peripheral stem cells, or progenitor cells to the location of the recipient within 24 hours after the match is made.

- **TRANSPLANT SERVICES**

– **Organ and Tissue Transplant Procedures**

Subject to the Exclusions, conditions, and limitations of the Plan, Benefits will be provided for Covered Services rendered by a Hospital, Physician, or other Provider for the human organ and tissue transplant procedures set forth below.

- Musculoskeletal transplants;
- Parathyroid transplants;
- Cornea transplants;
- Heart-valve transplants; and
- Kidney transplants.

– **Other Major Organ Transplant Procedures**

Subject to the Exclusions, conditions, and limitations of the Plan, Benefits will be provided for Covered Services rendered by a Hospital, Physician, or other Provider for the human organ and tissue transplant procedures set forth below.

- Heart Transplants

  Benefits will be provided for a heart transplant, provided the covered person:

  - has terminal heart disease with a life expectancy of 18 months or less;
  - has normal liver and kidney function;
  - has no concurrent malignancy, HIV (human immunodeficiency virus) infection or AIDS (acquired immunodeficiency syndrome); and
  - is psychologically stable and has a supportive social environment.

- Single Lung, Double Lung and Heart/Lung Transplants

  Benefits will be provided for a single lung, double lung or heart/lung transplant, provided the covered person:

  - has end-stage cardiopulmonary or pulmonary disease with a life expectancy of 18 months or less;
  - has no concurrent malignancy, HIV infection or AIDS;
  - has normal liver and kidney function; and
  - is psychologically stable and has a supportive social environment.



- Liver Transplants

  Benefits will be provided for a liver transplant, provided the covered person

  - has end-stage liver disease with a life expectancy of 18 months or less due to any of the following conditions:
    - extrahepatic biliary atresia;
    - primary biliary cirrhosis;
    - primary sclerosing cholangitis;
    - antigen-negative hepatitis B, antigen-negative or antigen-positive hepatitis C;
    - hepatic vein thrombosis (Budd-Chiari syndrome);
    - certain inborn errors of metabolism (such as Alpha-1-antitrypsin deficiency, Wilson's disease and primary hemochromatosis);
    - primary hepatocellular carcinoma; or
    - primary autoimmune hepatitis;
  - has normal kidney function;
  - has no concurrent extrahepatic malignancy (including extrahepatic extension or primary hepatocellular carcinoma), HIV infection or AIDS; and
  - is psychologically stable and has a supportive social environment.

  No Benefits will be provided for a covered person with end-stage liver disease as a result of viral hepatitis where the Subscriber remains antigen positive (except for hepatitis C), or whose primary cause of liver damage is secondary to alcohol abuse, unless it can be demonstrated that the covered person has abstained from alcohol for a period of no less than 12 months.

- Intestinal Transplants

  Benefits will be provided for a small bowel transplant using a cadaveric intestine for adult and pediatric covered person with short-bowel syndrome who have established long-term dependency on total parenteral nutrition and who have developed severe complications due to parenteral nutrition, provided the covered person:

  - has no concurrent malignancy, HIV infection or AIDS; and
  - is psychologically stable and has a supportive social environment.

- Small Bowel/Liver or Multivisceral (Abdominal) Transplants

  Benefits will be provided for a small bowel/liver transplant or multivisceral transplant for adult and pediatric covered person's with short bowel syndrome who have been managed with long-term parenteral nutrition and who have developed evidence of impending end-stage liver failure, provided the covered person:

  - has no concurrent malignancy, HIV infection or AIDS; and
  - is psychologically stable and has a supportive social environment.

- Pancreas Transplants

  - Benefits will be provided for a combined pancreas/kidney transplant for diabetic covered person with uremia, provided the covered person has no concurrent malignancy, HIV infection or AIDS; and is psychologically stable and has a supportive social environment.

  - Benefits will be provided for a pancreas transplant after a prior kidney transplant for covered person with insulin dependent diabetes mellitus, provided the covered person has no concurrent malignancy, HIV infection or AIDS; and is psychologically stable and has a supportive social environment.

  - Benefits will be provided for a pancreas transplant alone for covered person with severely disabling and potentially life-threatening complications due to hypoglycemia unawareness and labile diabetes that persists in spite of optimal medical management, provided the covered person has no concurrent malignancy, HIV infection or AIDS; and is psychologically stable and has a supportive social environment.

- Islet Cell Transplants

  Benefits will be provided for an autologous islet cell transplant for covered person undergoing total or near total pancreatectomy for intractable pain due to chronic pancreatitis.

– **Bone Marrow Transplants**

Not all autologous or allogeneic bone marrow transplants or stem cell or progenitor cell support procedures, whether performed as independent procedures or in combination with other therapies, e.g., High-Dose Chemotherapy and/or High-Dose Radiation Therapy, are covered. Benefits for Bone Marrow Transplants are not available for treatment of all conditions, or at all stages of a condition, even if the Provider may recommend such treatment.

Subject to the Exclusions, conditions, and limitations of the Plan, Benefits will be provided for Covered Services rendered by a Hospital, Physician, or other Provider for Bone Marrow Transplants to treat a condition on the Plan's list of approved conditions and medical criteria for eligibility of Benefits (the "Approved List").

If coverage is requested for a Bone Marrow Transplant procedure to treat a condition other than those on the Plan's Approved List, the request will be individually reviewed. If it is determined by the Plan that the transplant is not Medically Necessary for the covered person, is Experimental or Investigational, or is otherwise excluded from coverage, Benefits will be denied.

Medical research regarding the effectiveness of Bone Marrow Transplant procedures is ongoing. The Plan periodically reviews conditions to determine eligibility for Benefits. The covered person or the treating Provider may obtain the Plan's Approved List of conditions and medical criteria for eligibility for Benefits upon request.

- **EXCLUSIONS AND LIMITATIONS APPLICABLE TO ORGAN/TISSUE/BONE MARROW TRANSPLANTS**

  – In addition to the Exclusions set forth elsewhere in the Plan, no Benefits will be provided for the following organ or tissue transplants or Bone Marrow Transplants or related services:

    - Adrenal to brain transplants.

    - Allogeneic islet cell transplants.

    - High-Dose Chemotherapy or High-Dose Radiation Therapy if the associated autologous or allogeneic bone marrow transplant, stem cell or progenitor cell treatment or rescue is not a Covered Service.

    - Autologous or allogeneic bone marrow transplant and/or stem cell or progenitor cell treatment or rescue with or without High-Dose Chemotherapy or High-Dose Radiation Therapy for breast cancer patients with Stage I, II, or III disease or with refractory Stage IV disease.

    - Tandem transplants for autologous or allogeneic bone marrow or stem cell or progenitor cell treatment or rescue, with or without High-Dose Chemotherapy and/or High-Dose Radiation Therapy.

- Small bowel transplants using a living donor.
  - Liver transplant for a covered person with end-stage liver disease as a result of viral hepatitis where the covered person remains antigen positive (except for hepatitis C), or whose primary cause of liver damage is secondary to alcohol abuse, unless it can be demonstrated that the covered person has abstained from alcohol for a period of no less than 12 months.
  - Any organ or tissue transplant or Bone Marrow Transplant from a non-human donor or for the use of non-human organs for extracorporeal support and/or maintenance.
  - Any artificial device for transplantation/implantation.
  - Any organ or tissue transplant or Bone Marrow Transplant procedure which the Plan considers to be Experimental or Investigational in nature.
  - Expenses related to the purchase, evaluation, procurement services, or transplant procedure if the organ or tissue or bone marrow or stem cells or progenitor cells are sold rather than donated to the covered person recipient.
  - All services, provided directly for or relative to any organ or tissue transplant, or Bone Marrow Transplant procedure which is not specifically listed as a Covered Service in this Plan.

- The transplant must meet the criteria established by the Plan for assessing and performing organ or tissue transplants, or Bone Marrow Transplant procedures.
- The transplant must be performed in and by a Provider that meets the criteria established by the Plan for assessing and selecting Providers in the performance of organ or tissue transplants, or Bone Marrow Transplant procedures.

- Benefits will be provided for charges for transportation to and from the site of the covered organ transplant procedure for the recipient and one other individual or, in the event that the recipient or the donor is a minor, two other individuals.
- Benefits will be provided for the reasonable and necessary lodging and meal expenses incurred during the Transplant Benefit Period up to a maximum of $10,000 per Transplant Benefit Period.
- **DONOR BENEFITS**

  If a human organ, tissue or Bone Marrow Transplant is provided from a ***living*** donor to a human transplant recipient:

  - When both the recipient and the living donor are covered persons, each is entitled to the Benefits of the Plan.
  - When only the recipient is a covered person, both the donor and the recipient are entitled to the Benefits of the Plan. The donor Benefits are limited to only those not provided or available to the donor from any other source, up to a maximum of $10,000. This includes, but is not limited to, other insurance coverage or other Blue Cross or Blue Shield coverage or any government program. Benefits provided to the donor will be charged against the recipient's coverage under the Plan.
  - When only the living donor is a covered person, the donor is entitled to the Benefits of the Plan. The Benefits are limited to only those not provided or available to the donor from any other source. This includes, but is not limited to, other insurance coverage or other Blue Cross or Blue Shield coverage or any government program available to the recipient. There are no Covered Services for the non-covered person transplant recipient.
  - If any organ or tissue or bone marrow or stem cells or progenitor cells are sold rather than donated to the covered person recipient, no Covered Services will be provided for the purchase price, evaluation, procurement services or procedure.
  - The Plan is not liable for transplant expenses incurred by donors, except as specifically provided.

- RESEARCH–URGENT BONE MARROW TRANSPLANT BENEFITS WITHIN NATIONAL INSTITUTES OF HEALTH CLINICAL TRIALS ONLY

  Bone Marrow Transplants that are otherwise excluded by the Plan as Experimental or Investigational are eligible for Benefits if the Bone Marrow Transplant meets all of the following criteria:

  - It is therapeutic (not diagnostic or supportive) treatment used to directly improve health outcomes for a condition that is life threatening and that has a poor prognosis with the most effective conventional treatment. For purposes of this provision, a condition is considered life threatening if it has a substantial probability of causing premature death and all other conventional treatments have failed, or are not medically appropriate;

  - The Bone Marrow Transplant is available to the covered person seeking it and will be provided within a clinical trial conducted or approved by the **National Institutes of Health**;

  - The Bone Marrow Transplant is not available free or at a reduced rate; and

  - The Bone Marrow Transplant is not excluded by another provision of the Plan.

Covered Transplant expenses will accumulate during a Transplant Benefit Period and will be applied towards the Transplant Benefit Period maximums, if any. This will mean that you will not have to meet a new deductible or out of pocket amount if the Benefit Period continues from one calendar year to the next.

TRANSPLANT BENEFIT PERIOD means the period from the date the covered person receives prior authorization and has an initial evaluation for the transplant procedure until the earliest of, (a) one year from the date the transplant procedure was actually performed; (b) the date coverage under this Plan terminates; or (c) the date of the covered person's death. If the Transplant is a Bone Marrow transplant, the date the marrow is reinfused is considered the date of the transplant.

Expenses incurred for the recipient and the donor will accumulate towards the recipient's benefit and will be included in the Plan's overall per person maximum lifetime benefit.

Limitations on Transplant and Re-Transplants

- Re-transplantation will be covered up to two re-transplants, for a total of three transplants per person, per lifetime.
- Each transplant and re-transplant will have a new Transplant Benefit Period and a new maximum benefit.

Allowable Charges. **After Deductible**

PPO 100% Non PPO 60%

**For more details on this provision, please see your Plan Administrator.**

**PRE-ADMISSION TESTING**

Allowable Charges. **After Deductible**:

PPO 90% Non PPO 60%

**PRESCRIPTION DRUGS**

Prescriptions can be purchased in one of the following ways. For long-term medications, the participant should obtain two (2) prescriptions for each medication from the physician: one for a short-term supply and another for the longer-term supply.

## ELIGIBLE EXPENSES

With Prescription Card
If you need medication only on a **short-term basis**, this is the plan to use. Your short-term prescriptions will be provided after a $10.00 Copay for GENERIC DRUGS and a $17.50 Copay for NAME BRAND DRUGS for up to a *34 day supply*. You will be given an ID Card which you must show each time you buy a Covered Drug at a participating Pharmacy. You do not have to file a claim for benefits. If you buy a Covered Drug at a non-participating Pharmacy, you will have to pay for the full price of the drug yourself.

**You will be limited to the original prescription and two (2) refills of the same medication with your Prescription Card. To obtain additional benefits of the same medication after this, you will have to use the Mail Order Program.**

With Mail Order Program
If you need medication on a **long-term, regular basis**, this is the Plan to use. Your long-term prescriptions will be provided to you after a $10.00 Copay for GENERIC DRUGS and a $17.50 Copay for NAME BRAND DRUGS for a 90 day supply. (An additional charge may be added if you request a Name Brand Drug when a Generic equivalent is available). This program will enable you to receive a larger supply of your medication for only one low copayment. Contraceptives including birth control pills are covered. You will receive your medication at home via U.S. Mail or United Parcel Service within 10 to 14 working days from the date you mail your order. Your copayment should accompany your order.

The following is a list of some of the possible drugs you will want to use the Mail Order Program for:

- Prozac
- Insulin
- Xanax
- Valium
- Premarin
- Lanoxin
- Seldane
- Elavil
- Pre-Natal Vitamins
- Diabeta
- Birth Control Pills
- Capoten

** *Injectables* (except immunizations) will be covered under both Plans. *Diabetic supplies* including lancets and test strips (excluding insulin which is covered under the regular copay plan) will be covered under both the Prescription Card and Mail Order Plan but will be allowed at 80%. Employee will be responsible for 20% of these charges.

The following is a list of Drugs and Medicines which **will not** be covered under either Plan:
- Vitamins (except Pre-Natal)
- Fertility drugs
- Viagra
- Anorexiants
- Accutane
- Retin A
- Drugs determined by the FDA as lacking substantial evidence of effectiveness
- Appetite suppressants; weight loss or dietary supplements
- Growth hormones (unless approved by Case Management)
- Topical Minoxidil (Rogaine) in any form
- Lupron (unless medical necessity)
- Non-legend (over the counter) drugs other than insulin
- Experimental drugs
- Nicorette Gum or any other smoking deterrent
- Therapeutic devices or appliances, including support garments and other non-medicinal substances, regardless of intended use.
- Refills of any prescription in excess of the number specified by the Licensed Physician.

## PREVENTIVE MEDICINE BENEFIT

The Preventive Medicine Benefit pays benefits based on the Allowable Charge for the following medical practices:

Well Child Care
Covered for eligible dependents from the date of newborn hospital discharge up to age 13. See Routine Physical Benefits for coverage for persons age 13 and over.

All Charges: No Deductible, 100% to a maximum of $200 Per Calendar Year

Routine Immunizations, Vaccinations and Booster Shots:
Covered for eligible dependents through the age of 13.

All Charges: No Deductible, 100%.

Mammography:

- One routine screening mammogram covered for females age 35 to 39
- Annual routine screening mammogram for females age 40 or over

All Charges: No Deductible, 100%

Routine Gynecological Exam/Pap Smear and Prostate Exam/PSA Test
Limited to one exam per year.

All Charges: No Deductible, 100%

Routine Physical Examinations
One annual routine physical for all covered employees and dependents age 13 and over.

All Charges Under Age 50 No Deductible, 100% to maximum of $300 Per Calendar Year

All Charges Over Age 50 No Deductible, 100% to maximum of $400 Per Calendar Year

## ROUTINE WELL-BABY IN-HOSPITAL NEWBORN CARE

Covered as any other illness for the newborn of any employee or spouse covered under the Plan, while the mother is hospital confined. These services and supplies include, but are not limited to, charges incurred for nursery services, pediatric examinations and circumcision. Expenses will be considered as part of the mother's deductible and regular coinsurance.

Group health plans and health insurance issuers generally may not, under Federal law, restrict benefits for any hospital length of stay in connection with childbirth for the mother or newborn child to less than 48 hours following a vaginal delivery, or less than 96 hours following a cesarean section. However, Federal law generally does not prohibit the mother's or newborn's attending provider, after consulting with the mother, from discharging the mother or her newborn earlier than 48 hours (or 96 hours as applicable). In any case, plans and issuers may not, under Federal law, require that a provider obtain authorization from the plan or issuer for prescribing a length of stay not in excess of 48 hours (or 96 hours).

## SICK BABY IN-HOSPITAL CARE

Covered as any other illness for the newborn of any employee or spouse covered under the Plan, who remains in the hospital after the mother has been discharged. Charges will be covered if the newborn is enrolled in the Plan within 31 days of birth. **After Deductible**:

PPO 90% Non PPO 60%

## SECOND SURGICAL OPINIONS

Allowable Charges for an examination performed by a board certified specialist, after another physician has proposed to perform the surgery, but prior to such performance. The physician performing the surgery cannot be the second opinion physician.

All Charges 100% No Deductible

## SKILLED NURSING FACILITY

Allowable Charges for expenses incurred in a Skilled Nursing Facility for a period not in excess of 365 days. A new maximum benefit period will commence only when there has been a lapse of at least 90 days between the date of the last discharge from a Skilled Nursing Facility and the date of the next admission to a Skilled Nursing Facility due to the same or related causes, whether or not benefits were provided for the prior admission. **After Deductible**:

PPO 90% Non PPO 60%

## SURGERY

Payment includes visits before and after Surgery.

If an incidental procedure* is carried out at the same time as a more complex primary procedure, then Benefits will be payable for only the primary procedure. **Separate Benefits will not be payable for any incidental procedures performed at the same time.**

When more than one surgical procedure is performed through more than one route of access during one operation, you are covered for:

- the primary procedure; plus
- 50% of the amount payable for each of the additional procedures had those procedures been performed alone.

Sterilization, regardless of Medical Necessity.

Services of a Physician who actively assists the operating surgeon in the performance of covered Surgery. Benefits will be provided for an assistant surgeon only if determined Medically Necessary by the Plan. **After Deductible:**

PPO 90% Non PPO 60%

## THERAPY EXPENSES

Allowable Charges for services of physical, occupational and speech therapy except as specifically excluded. Providers of services must be licensed and operating in accordance with any applicable state laws. Speech therapy must be rendered by a qualified speech therapist and done to restore speech loss or correct an impairment that is due to either a congenital defect for which corrective surgery was performed, or an illness (excluding mental illness) or injury. **After Deductible:**

PPO 90% Non PPO 60%

* *A procedure carried out at the same time as a primary surgical procedure, but which is clinically integral to the performance of the primary procedure, and, therefore, should be reimbursed separately.*

## COMPREHENSIVE MAJOR MEDICAL EXCEPTIONS

**Benefits are not payable under this Plan with respect to expenses incurred for:**

1. Sickness or injury arising out of or in the course of a Covered Person's employment for pay or profit.
2. Charges for which you are covered under Worker's Compensation or some similar Local, State, or Federal Statue.
3. Services rendered in a government hospital unless you are required to pay for such services.
4. Services to which the patient is entitled without charge, or for which there would be no charge if there were no coverage.
5. Intentionally self-inflected injury/illness, whether sane or insane; or attempted suicide.
6. Injury or illness resulting from taking part in the commission of an assault or felony.
7. Injury or illness due to war or an act of war.
8. Services or supplies received because of cosmetic surgery or treatment. Cosmetic surgery or treatment is that which is performed on a body part in whole or in part in order to improve its appearance. Cosmetic surgery or treatment will be covered if it is:
   a) reconstructive surgery when it is incidental to or follows surgery which results in sickness or injury of the involved body part;
   b) to correct deformities caused by sickness or accident;
   c) to correct birth defects which are outside the normal range of human variation;
   d) Reconstructive surgery as provided by the Mastectomy provision of this Plan
9. Services or supplies which are considered to be experimental, investigational or for research purposes in the diagnosis or treatment of the injury or sickness for which claim is made.
10. In-vitro fertilization, artificial insemination, infertility treatment, and all related expenses. This includes any test or procedure performed on the Covered Person.
11. Charges for or related to sex change surgery or any treatment of gender identity disorders.
12. Reversal of an elective sterilization procedure.
13. Charges for treatment of sexual problems not caused by organic disease.
14. Dental services, except those listed under **Dental Expenses** described earlier in this book.
15. Eye exams and eye glasses or contact lenses and the fitting of such (except the first pair after cataract surgery while covered).
16. Surgical correction of eye refraction which can be corrected by eyeglasses or lenses (including Radial Keratotomy, Keratectomy, Keratoplasty).
17. Hearing tests, hearing aids and their fitting.
18. Any treatment of obesity, except treatment of underlying disease or diagnosed medical conditions.
19. Services and supplies which are not medically necessary for treatment of sickness or injury except if listed under Preventive Medicine Benefit.
20. Acupuncture when performed for any purpose.
21. Services and supplies for a lipectomy. This includes any surgical or suction lipectomy procedure.
22. Physical reconditioning programs to restore, improve, or maintain the physical fitness of a Covered Person including, but not limited to, physical activities, exercise programs or regimes and the equipment to perform such activities.
23. Expenses for Speech Therapy unless such therapy is rendered by a qualified speech therapist and is done to restore speech loss or correct an impairment that is due to either a congenital defect for which corrective surgery was performed, or an illness (excluding mental illness) or injury. Speech therapy performed as a result of a developmental disorder or from a learning disability is not covered.
24. Testing by a Physician when the test is used for: vocational guidance, personality fulfillment; or marital counseling.
25. Hospital care or confinement in an institution which is primarily a place for nursing, rest care, convalescence, custodial or educational care.
26. Cognitive skill training, vision training, and educational training.
27. Charges for foot care only to improve comfort or appearance such as care for flat feet, subluxation, corns, bunions (except capsular and bone surgery), calluses, toenails, and the like (except when surgery is performed).
28. Arch supports and other foot support devices, elastic stockings, garter belts or similar devices, or orthopedic shoes.
29. Charges incurred as a result of or in connection with the pregnancy of a dependent child.
30. Charges for professional medical or surgical services rendered by a person who is related to the covered person by blood or marriage, or a person who normally resides in the covered person's household.
31. Services and supplies for behavior modification programs including, but not limited to: smoking cessation, weight reduction and exercise programs.
32. Charges for telephone consultations, missed appointments, or completion of a claim form.
33. Charges for personal hygiene and convenience items such as air conditioners and humidifiers.
34. Abortions unless the life of the mother would be in danger if pregnancy continued.
35. Services or treatment which is primarily custodial or educational in nature.
36. Treatment for realignment of teeth or jaws, including, but not limited to, atrophy of the lower jaw, occlusion, temporomandibular joint (TMJ) dysfunction and retrognathia (unless surgery is performed).
37. The part of an expense for care and treatment of an injury or sickness that is in excess of the Allowable Charge.

## COORDINATION OF BENEFITS (COB)

**Applicability**
This coordination of benefits ("COB") provision applies to this Plan when an employee or the employee's covered dependent has health care coverage under more than one plan.

If this COB provision applies, the order of benefit determination rules should be looked at first. Those rules determine whether the benefits of this Plan are determined before or after those of another plan. The benefits of this Plan:

a) Shall not be reduced when, under the order of benefit determination rules, this Plan determines its benefits before another plan; but
b) May be reduced when, under the order of benefit determination rules, another plan determines its benefits first. The above reduction is described in "Effect on the Benefits of This Plan."

**Definitions**
a) "Plan" is any of these which provides benefits or services for, or because of, medical or dental care or treatment:
   1. Group insurance or group-type coverage, whether insured or uninsured. This includes prepayment, group practice or individual practice coverage. It also includes coverage other than school accident-type coverage.
   2. Coverage under a governmental plan or required or provided by law. This does not include a state plan under Medicaid (Title XIX, Grants to States for Medical Assistance Programs, of the United States Social Security Act as amended from time to time). It also does not include any plan when, by law, its benefits are in excess to those of any private insurance program or other nongovernmental program. Each contract or other arrangement for coverage under (1) or (2) is a separate plan. Also, if an arrangement has two parts and COB rules apply only to one of the two, each of the parts is a separate plan.
b) "This Plan" is the part of the group contract that provides benefits for health care expenses.
c) "Primary plan"/"Secondary plan". The order of benefit determination rules state whether this Plan is a primary plan or secondary plan as to another plan covering the person. When this Plan is a primary plan, its benefits are determined before those of the other plan and without considering the other plan's benefits. When this plan is a secondary plan, its benefits are determined after those of the other plan and may be reduced because of the other plan's benefits. When there are more than two plans covering the person, this Plan may be a primary plan as to one or more other plans, and may be a secondary plan as to a different plan or plans.
d) "Allowable expense" means a necessary, reasonable, and customary item of expense for health care, when the item of expense is covered at least in part by one or more plans covering the person for whom the claim is made. The difference between the cost of a private hospital room and the cost of a semi-private hospital room is not considered an allowable expense under the above definition unless the patient's stay in a private hospital room is medically necessary either in terms of generally accepted medical practice, or as specifically defined in the plan. When a plan provides benefits in the form of services, the reasonable cash value of each service rendered will be considered both an allowable expense and a benefit paid.

When benefits are reduced under a primary plan because a covered person does not comply with the plan provision, the amount of such reduction will not be considered an allowable expense. Examples of such provisions are those related to second surgical opinions, precertification of admissions or services, and preferred provider arrangements.

e) "Claim determination period" means a calendar year. However, it does not include any part of a year during which a person has no coverage under this Plan, or any part of a year before the date this COB provision or a similar provision takes effect.

**Order of Benefit Determination Rules**
When there is a basis for a claim under this Plan and another plan, this Plan is a secondary plan which has its benefits determined after those of the other plan, unless:

a) The other plan has rules coordinating its benefits with those of this Plan; and
b) Both those rules and this Plan's rules, as listed below, require that this Plan's benefits be determined before those of the other plan.

This Plan determines its order of benefits using the first of the following rules which applies:

a) Nondependent/dependent. The benefits of the plan which covers the person as an employee, member or subscriber (that is, other than as a dependent) are determined before those of the plan which covers the person as a dependent.
b) Dependent child/parents not separated or divorced. Except as stated in subparagraph 3) below, when this Plan and another plan cover the same child as a dependent of different persons, called "parents":

1. The benefits of the plan of the parent whose birthday falls earlier in a year are determined before those of the plan of the parent whose birthday falls later in that year; but
2. If both parents have the same birthday, the benefits of the plan which covered one parent longer are determined before those of the plan which covered the other parent for a shorter period of time.

c) Dependent child/separated or divorced parents. If two or more plans cover a person as a dependent child of divorced or separated parents, benefits for the child are determined in this order:
   1. First, the plan of the parent with custody of the child;
   2. Then, the plan of the spouse of the parent with the custody of the child; and
   3. Finally, the plan of the parent not having custody of the child.

If the specific terms of a court decree state that one of the parents is responsible for the health care expense of the child, and the entity obligated to pay or provide the benefits of the plan of that parent has actual knowledge of those terms, the benefits of that plan are determined first. This paragraph does not apply with respect to any claim determination period or plan year during which any benefits are actually paid or provided before the entity has that actual knowledge.

d) Joint custody. If the specific terms of a court decree state that the parents shall share joint custody, without stating that one of the parents is responsible for the health care expenses of the child, the plans covering the child shall follow the order of benefit determination rules outlined in 3.b).

e) Active/inactive employee. The benefits of a plan which covers a person as an employee who is neither laid off nor retired (or as that employee's dependent) are determined before those of a plan which covers that person as a laid off or retired employee (or as that employee's dependent). If the other plan does not have this rule, and if, as a result, the plans do not agree on the order of benefits, this rule (e) is ignored.

f) Continuation coverage. If a person whose coverage under a right of continuation pursuant to federal or state law also is covered under another plan, the following shall be the order of benefit determination:
   1. First, the benefits of a plan covering the person as an employee, member or subscriber (or as that person's dependent);
   2. Second, the benefits under the continuation coverage.

If the other plan does not have the rule described above, and if, as a result, the plans do not agree on the order of benefits, this rule is ignored.

g) Longer/shorter length of coverage. If none of the above rules determines the order of benefits, the benefits of the plan which covered an employee, member or subscriber longer are determined before those of the plan which covered that person for the shorter term.

**Effect on the Benefits of This Plan**

This section applies when, in accordance with the Order of benefit Determination Rules, this Plan is a secondary plan as to one or more other plans. In that event the benefits of this Plan may be reduced under this section. Such other plan or plans are referred to as "the other plans" immediately below.

The benefits of this Plan will be reduced when the sum of:

a) The benefits that would be payable for the allowable expense under this Plan in the absence of this COB provision; and

b) The benefits that would be payable for the allowable expenses under the other plans, in the absence of provisions with a purpose like that of this COB provision, whether or not claim is made, exceed those allowable expenses in a claim determination period. In that case, the benefits of this Plan will be reduced so that they and the benefits payable under the other plans do not total more than those allowable expenses.

When the benefits of this Plan are reduced as described above, each benefit is reduced in proportion. It is then charged against any applicable benefit limit of this Plan.

**Right To Receive and Release Needed Information**

Certain facts are needed to apply these COB rules. The Plan Administrator has the right to decide which facts it needs. It may get needed facts from or give them to any other organization or person.

The Plan Administrator need not tell, or get the consent of, any person to do this. Each person claiming benefits under this Plan must give the Plan Administrator any facts it needs to pay the claim.

**Facility of Payment**

A payment made under another plan may include an amount which should have been paid under this Plan. If it does, the Plan may pay that amount to he organization which made that payment. That amount will then be treated as though it were a benefit paid under this Plan.

The Plan will not have to pay that amount again. The term "payment made" includes providing benefits in the form of services, in which case "payment made" means reasonable cash value of the benefits provided in the form of services.

**Right of Recovery**
If the amount of the payments made by the Plan is more than it should have paid under this COB provision, it may recover the excess from one or more of:

a) The persons it has paid or for whom it has paid;
b) Insurance companies; or
c) Other organizations.

The "amount of the payments made" includes the reasonable cash value of any benefits provided in the form of services.

## PRE-EXISTING CONDITIONS

A pre-existing condition is any illness, disease or injury for which a Covered Person has received any medical care, treatment, services, medication, diagnosis or consultation within 90 days immediately preceding the covered person's enrollment date in this Plan. Pregnancy is not considered a pre-existing condition. Newborn children and children (under age 18) who are adopted or placed for adoption are exempt from this exclusion provided that they are enrolled in creditable coverage (including this Plan) within 30 days of birth, adoption, or placement for adoption and have no subsequent significant break in coverage.

Expense for any pre-existing condition incurred by a covered person after his effective date in this Plan shall not be eligible for benefits until twelve (12) months have passed since the Covered Person's enrollment date.

A pre-existing condition exclusion period may be decreased by the amount of creditable coverage (*including coverage under the Sheffield Steel Active Plan*). The exclusion period is reduced by one day for each day a covered person was under one or more types of creditable coverage. Only one day of creditable coverage will be counted regardless whether the individual is covered under more than one plan on that day. Days of creditable coverage that occur before a significant break in coverage (see DEFINITIONS) are not counted.

## ESTABLISHING CREDITABLE COVERAGE

Creditable coverage may be demonstrated in two ways. The first way is by a certificate which the applicant should have received at the time their other coverage ceased. An individual may also request, and receive, a certification of creditable coverage from their prior plan. The prior plan is required to provide the certificate by the earliest date that the plan or health insurance issuer, acting in a reasonable and prompt fashion, can provide the certificate, provided the request is made within twenty four (24) months of the date prior coverage ended. If necessary, this Plan will assist the individual in obtaining such certification.

To demonstrate creditable coverage without a certification the individual must: attest in writing to the existence of creditable coverage, supply relevant, supporting evidence of such coverage and cooperate with this Plan's efforts to verify the existence and duration of the coverage.

** Anyone covered under the Active Plan at the time of the retirement will be given credit automatically under the Employee Plan for each day covered.

## REFUND FOR OVERPAYMENTS OF BENEFITS

This Plan has the right, if any overpayment has been made under this Plan, to recover such excess payment from any individual to whom, or for, or with respect to the payments that were made, by any other insurance company (ies), or any other organization(s) or plans.

## SUBROGATION/RIGHT OF REIMBURSEMENT

The Plan shall be subrogated to all rights, claims, interest and causes of action against any third party liable to the individual to receive benefits under the Plan. This Plan shall further be entitled to reimbursement from the proceeds of any recovery from such liable third party. This Plan shall be entitled to such right of subrogation and/or reimbursement in the amount and to the extent of any payment(s) so made by this Plan. This right of subrogation and/or reimbursement is reserved whether the liability of said third party arises in tort, contract or otherwise. Regardless of how proceeds are designated, the rights conferred herein attach to any judgment, settlement, or other recovery.

In order for benefits to be paid by the Plan for expenses resulting from injury for which a third party is liable, the individual to receive benefits under the Plan shall execute a Subrogation/Right of Reimbursement Agreement, in a form prescribed by the Plan. As a further condition to receive benefits, the individual shall cooperate fully in the enforcement of the Plan's rights, shall take all actions necessary to secure the Plan of such rights, and in no way prejudice or diminish such rights unless the Plan expressly consents to such action in writing.

It is acknowledged that the rights of the Plan shall constitute a first priority claim against any proceeds paid by, or on behalf of, the liable third party, regardless of whether said recovery renders the individual whole. Recoveries from, or on behalf of, the liable third party shall be held in trust for the benefit of the Plan and for the purpose of securing and satisfying the Plan's first priority claim created herein.

Amounts recovered by the Plan may be reduced, as agreed by the Plan, for payment of reasonable and necessary expenditures, including attorneys fees, incurred in effecting the recovery of Plan benefits.

Failure to fully comply with the provisions of this section shall entitle the Plan to withhold payment of accrued or future benefits until the Plan's right of subrogation and/or reimbursement have been fully satisfied or offset with benefits otherwise payable.

Agents, assigns, representative, heirs, beneficiaries, legatees and other personal representatives are deemed to be an individual to receive benefit payments under this Plan.

## BENEFITS FOR SERVICES OUTSIDE THE STATE OF OKLAHOMA

All Blue Cross and Blue Shield Plans participate in a national program called the "BlueCard Program". This national program benefits Blue Cross and Blue Shield Covered Persons who receive Covered Services outside the state of Oklahoma.

When you obtain health care services through BlueCard outside the state of Oklahoma, the amount you pay for Covered Services is calculated on the ***lower*** of:

- The billed charges for your Covered Services; or
- The negotiated price that the on-site Blue Cross and/or Blue Shield Licensee ("Host Blue") passes on to us.

Often, this "negotiated price" will consist of a simple discount which reflects the actual price paid by the Host Blue. But sometimes it is an estimated price that factors into the actual price expected settlements, withholds, any other contingent payment arrangements and non-claims transactions with your health care Provider or with a specified group of Providers. The negotiated price may also be billed charges reduced to reflect an ***average*** expected savings with your health care Provider or with a specified group of Providers. The price that reflects average savings may result in greater variation (more or less) from the actual price paid than will the estimated price. The negotiated price will also be adjusted in the future to correct for overestimation or underestimation of past prices. However, the amount you pay is considered a final price.

Statutes in a small number of states may require the Host Blue to use a basis for calculating Covered Person liability for Covered Services that does not reflect the entire savings realized, or expected to be realized, on a particular claim or to add a surcharge. Should any state statutes mandate Covered Person liability calculation methods that differ from the usual BlueCard method noted in the above paragraph or require a surcharge, Blue Cross and Blue Shield of Oklahoma would then calculate your liability for any covered health care services in accordance with the applicable state statute in effect at the time you received your care.

NOTE: **Blue Cross and Blue Shield of Oklahoma may postpone application of your Deductible, Coinsurance and/or Copayment amounts whenever it is necessary so that we may obtain a Provider discount for you on Covered Services you receive outside the state of Oklahoma.**

## ACCIDENT

Any unforeseen or unexplained sudden bodily injury occurring by chance without intent or volition. Does not include illness or disease.

## ALLOWABLE CHARGE

The charge that the Claims Administrator will use as the basis for Benefit determination for Covered Services you receive under the Plan. The Claims Administrator will use the following criteria to establish the Allowable Charge.

a) **BlueChoice PPO and BlueCard PPO Providers** - the Provider's usual charge, not to exceed the amount the Provider has agreed to accept as payment for Covered Services in accordance with a BlueChoice PPO or BlueCard PPO Provider Agreement.
b) **BlueTraditional Providers** - the Provider's usual charge, not to exceed the amount the Provider has agreed to accept as payment for Covered Services in accordance with a BlueTraditional Provider Agreement.
c) **Non-PPO Providers** - the Provider's usual charge, up to the amount the Claims Administrator would reimburse a BlueTraditional Provider for the same service.

**NOTE: For Covered Services received outside the state of Oklahoma, the "Allowable Charge" may be determined by the on-site Blue Cross and Blue Shield Plan. Payment will be based upon the Provider payment arrangements in effect between the Provider and the on-site Plan.**

## AMBULATORY SURGICAL CENTER

A permanent facility equipped and operated primarily for the purpose of performing surgery, and

a) has an organized staff of doctors; and
b) has continuous services of doctors and registered, professional nurses while a patient is in the facility; and
c) has no services or accommodations for patients to stay overnight.
d) is licensed or accredited by the jurisdiction in which it is located.

## CONVALESCENT HOSPITAL/EXTENDED CARE FACILITY

A place that:

a) Provides room and board and 24 hour a day nursing care by, or under the direction of a nurse;
b) Is accredited as an Extended Care Facility by the Joint Commission on Accreditation of Hospitals or is recognized as an Extended Care Facility by Medicare; and
c) Is not, other than incidentally: a hotel; a motel; a place for rest; or a place for custodial care, the aged, drug addicts or alcoholics.

## COVERED EXPENSES

"Covered Expenses", also known as "Eligible Expenses", shall mean prevailing, reasonable and customary charges in the community where the services are incurred by a covered person for an illness or accidental injury, only if medically necessary. In addition, the Plan may provide benefits for certain services not resulting from illness or injury.

## COVERED PERSON

Any employee or dependent who meets the eligibility requirements for coverage as specified in this Plan and is properly enrolled in this Plan.

## CREDITABLE COVERAGE

Creditable coverage means coverage of the individual under any of the following, excluding excepted benefits, as defined in HIPAA (Health Insurance Portability and Accountability Act):

a) Group Health Plan
b) Health Insurance
c) Medicare
d) Medicaid
e) CHAMPUS
f) State Risk Pool

g) Federal Employee Health Plan
h) Public Health Plan
i) Peace Corps Health Plan
j) Health care plans run by the Indian Health Service

## CUSTODIAL CARE

Services and supplies provided to you (or your dependent), whether or not you are disabled, which do not contribute greatly to the improvement of a medical condition according to generally accepted standards. Such care includes, but is not limited to:

a) Assisting you to walk; get in and out of bed; bathe; dress; prepare special diets; supervise medicine which can usually be self administered and which does not require the attention of medical or paramedical personnel; and
b) Assisting you in other activities of daily life.

Such care is custodial without regard to the provider by which it is prescribed, referred or performed.

## DOCTOR

An individual who is legally licensed to practice medicine. A licensed practitioner will be considered a doctor if:

a) there is a law which applies to this Plan and that law requires that any services performed by such a practitioner must be considered for benefits on the same basis as if the service were performed by a doctor; and
b) the services performed by the practitioner is within the scope of his or her license.

Doctor will not include a person who ordinarily resides in the patient's home, or a person who is the patient's spouse, child, brother, sister, or parent, or parent of the patient's spouse.

## EMERGENCIES

An Emergency must result: from Injury or from the sudden onset of a medical condition. The condition must be one which manifests itself by acute symptoms which are sufficiently severe (including severe pain) that without immediate medical care the person could reasonably expect that:

a) His life or health would be in jeopardy; or
b) His bodily functions would be seriously impaired; or
c) A body organ or part would be seriously damaged.

## EXPERIMENTAL PROCEDURE

Shall include:

1) Care, procedure, treatment protocol or technology which:
   a) Is not widely accepted as safe, effective and appropriate for the injury or sickness throughout the recognized medical profession and established medical societies in the United States; or
   b) Is experimental, in the research or investigational stage or conducted as part of research protocol, or has not been proved by statistically significant randomized clinical trials to establish increased survival or improvement in the quality of life over other conventional therapies;

2) Drugs, test, and technology which:
   a) the FDA has not approved for general use;
   b) Are considered experimental;
   c) Are approved for a specific medical condition but applied to another condition.

The Plan Administrator may rely on the Data Project of the American Medical Association, the National Institute of Health, the U.S. Food and Drug Administration, The National Cancer Institute, Office of Health Technology Assessment, Health Care Financing Administration, and Congressional Office of Technology Assessment in determining experimental procedures. The final decision shall be at the discretion of the Plan Administrator.

## HOME HEALTH CARE

**The services listed below which:**

a) Are provided in the home (except for physician's office visits) by a licensed or certified home health agency;
b) Are provided following confinement in a Hospital or skilled nursing home and when continued confinement would otherwise be required;

c) Are required for the care or treatment of sickness or injury; and
d) Are given on the written request of a physician

Home Care services include:

a) Visits by a physician;
b) Visits by a nurse to provide nursing services;
c) Visits to provide home health aide services consisting mainly of care of the patient;
d) Visits to provide services by licensed therapists; and
e) Medical equipment and supplies which would be covered if provided by a hospital
f) Social services, if provided by the Home Health Agency.

**Visit**

On Site care, up to four (4) hours, by a covered provider of Home Care. Benefits are limited to one visit per provider per calendar day.

## HOSPICE CARE

A Hospice is an agency that provides counseling and incidental medical services for a terminally ill individual. Room and board may be provided. The main purpose of the agency is to provide Hospice services, which must be under the direct supervision of a duly qualified doctor and be approved under any required state or government Certificate of Need and is established and operated in accordance with any applicable state laws.

The doctor must certify that the patient is terminally ill with 6 months or less to live. Counseling for the patient and the patient's immediate family are provided and bereavement counseling for the patient's immediate family is available within 6 months after the patient's death.

## HOSPITAL

**A facility which:**

a) Is legally licensed as a hospital; and accredited by the Joint Commission on the Accreditation of Hospitals (JCAH); and
b) Provides a broad range of 24 hour a day medical and surgical services for sick and injured persons by, or under the supervision of a staff of doctors; and
c) Provides 24 hour a day nursing care by, or under the direction of a nurse.

## ILLNESS

A sickness or disease, including mental infirmity, that requires treatment by a physician. For purposes of determining benefits payable, illness shall include pregnancy, childbirth or miscarriage and complication thereof, sterilization of either sex and circumcision.

## INJURY

A condition caused by accidental means of an external force which results in damages to the covered person's body.

## MANIPULATIVE THERAPY

The care and service for the analysis and adjustment of spinal subluxations or for diagnosis and treatment by manipulation of the skeletal structure for other than fractures and dislocations.

## MEDICALLY NECESSARY

Health care services, supplies or treatment that are required to identify or treat the illness or injury which a physician has diagnosed or reasonably suspects. To be medically necessary the service, supplies or treatment must be:

a) consistent with the diagnosis and treatment of the patient's condition;
b) consistent with professionally recognized standards of health care;
c) not solely for the convenience of the patient, physician or supplier; and
d) performed in the least costly setting required by the patient's medical condition.

## MEDICARE

Health Insurance for the Aged and Disabled provisions of the Social Security Act of the United States as it is now and as it may be amended.



## NURSE

A registered professional nurse (R.N.), licensed practical nurse (L.P.N.), licensed vocational nurse (L.V.N.) or Certified Nurse Midwife.

## PARTIAL HOSPITALIZATION

Partial Hospitalization Programs are out-patient programs developed by hospitals requiring the patient to attend group sessions.

## PRE-ADMISSION TESTING

Includes diagnostic, laboratory and x-ray tests which are rendered in a clinic or hospital out-patient department preceding a scheduled in-patient confinement.

## SECOND SURGICAL OPINION

An opinion by a consulting doctor who examines the patient to evaluate the necessity that the patient undergo the proposed surgery. The second surgical opinion must be performed:

a) after one surgeon has proposed to perform the surgery on the patient but prior to the time the surgery is performed; and
b) by a Board Certified doctor who has regularly performed the proposed surgical procedure.

A doctor who gives a second opinion must not be the same doctor who later performs the recommended surgery; otherwise his opinion will not be considered a second opinion.

## SIGNIFICANT BREAK IN COVERAGE

A period of 63 consecutive days during all of which the participant does not have any creditable coverage. Neither a waiting period nor an affiliation period is taken into account in determining a significant break in coverage.

## SKILLED NURSING FACILITY

A facility approved as such by Medicare or accredited by the Joint Commission on Accreditation of Hospitals. It is engaged primarily in providing in-patient services for skilled nursing care or skilled rehabilitative care and these services are performed by, or under the supervision of a registered graduate nurse (R.N.). The services also must be under the general direction of a doctor. It must not be mainly a place of rest, a place for the aged, or a nursing or convalescent home.

## SURGICAL EXPENSE BENEFITS

The maximum allowable amount for all surgical procedures performed in any one series of operations is as follows:

a) when two or more procedures are performed during the course of a single operation through the same incision, or in the same natural body orifice, or in the same operative field, the maximum allowable amount will be equal to the largest of the procedure amounts for the respective procedures plus 50% of the allowable amount for the second procedure.
b) when two or more surgical procedures are performed at the same operative session in separate operative fields and through separate incisions, the maximum allowable amount shall be the sum of the procedure amounts allowable for each procedure.
c) when a bilateral procedure is performed at the same operative session in separate operative fields, the maximum allowable amount shall be 150% of the procedure amount allowable for the unilateral procedure.

## TEMPOROMANDIBULAR JOINT DYSFUNCTION SYNDROME (TMJ)

Disease or symptoms of the jaw joint(s) and/or associated parts resulting in pain or the inability of the jaw to work properly. "Associated parts of the jaw" means those functional parts that make the jaw work.



## IMPACT OF MEDICARE AND GOVERNMENT PLANS ON MEDICAL CARE BENEFITS

### MEDICARE

If you or a dependent of yours is or upon proper application would be entitled without charge to hospital insurance benefits under Part A (Hospital Insurance Benefits) of Title XVIII of the Social Security Act – Health Insurance for the Aged and Disabled (Medicare), you or such dependent shall be presumed by this plan to be so entitled on the first day on which you or such dependent is or upon proper application would become so entitled, whether or not proper application has been made. And if you or a dependent of yours is entitled or upon proper application would be entitled, by reason of attainment of age 65 or disability to payments under Part B of Medicare (Supplementary Medical Insurance Benefits), you or such dependent shall be presumed by this plan to be so entitled on the first day on which you or such dependent is or upon proper application would become so entitled, whether or not enrollment in the insurance program established by such Part B has been accomplished. The following shall apply to you or such dependent:

a) to the extent that the benefits of the Plan are provided under Medicare Part A, they shall not be provided under the Plan, *except* to assist in covering any Medicare Deductible Amount as shown in the Schedule of Benefits – Coverage When Eligible for Medicare; and
b) for any of the physician's services benefits of the Plan (which are covered under Medicare Part B), or any hospital benefits of the Plan covered under Medicare Part B, payment under the Plan shall be equal to the benefit which would otherwise be payable as shown in the Schedule of Benefits – Coverage When Eligible for Medicare, *except* that there will be no payment under the Plan for any covered service for which 100% reimbursement of the Plan's reasonable charge is made by Medicare.

It is most important that when you or a dependent of yours approaches age 65, you or such dependent enroll for Medicare A (if Medicare A is available without charge) and accept enrollment for Medicare B at the nearest Social Security Office during the three-month period before the 65th birthday.

It is also important that if you or a dependent of yours becomes eligible for Medicare B by reason of disability, you accept enrollment for Medicare B following notification by the government of your automatic enrollment in Medicare A and your eligibility for Medicare B. Such timely enrollment will avoid the loss of valuable protection against medical expenses.

You must advise your benefits administrator at Sand Springs, of the effective date of such Medicare coverage applicable to you or to one of your eligible dependents. Failure to do so could result in overpayment of benefits, which amount would have to be repaid by you.

**Benefits While Traveling Outside the United States or Puerto Rico**

If you are hospitalized and/or treated by a physician for an emergency while traveling outside the United States or Puerto Rico, you will probably be required to pay the provider for such services since hospitals and physicians in foreign countries generally do not honor Insurance Coverage or Medicare Identification Cards. Be sure to obtain itemized receipts detailing the dates and types of services performed and the charges incurred. Such receipts are then to be submitted to the Company's Plan(s) shown on your Identification Card(s) for reimbursement on the same basis as if the expenses were incurred in the United States. If you are eligible for Medicare but Medicare benefits are not payable because Medicare does not cover care outside the United States (except for certain services incurred in Canada or Mexico), benefits will be provided under the Plan as shown in the Schedule of Benefits – Coverage When Eligible for Medicare (see Out of Country).

### GOVERNMENT PLANS

To the extent that services or supplies, or benefits for them, are available to a Covered Person under a Government Plan, they will not be considered for Medical Care Benefits under this Plan. This provision will apply whether or not the Covered Person is enrolled for all Government Plans for which that Covered Person is eligible.

This provision will not apply to a Government Plan if that Government Plan requires that Medical Care Benefits under this Plan be paid first.

## TERMINATION AND CONTINUATION OF COVERAGE

### EMPLOYEE

Unless otherwise specified in this booklet, your coverage will automatically terminate on the earliest of the following dates:

a) the day on which such person ceases to be eligible for coverage under the Plan;
b) the end of the month in which notice from the pensioner or surviving spouse is received by Sheffield Steel Corp. requesting termination of coverage under the Plan; or
c) the end of the month for which you last paid the required monthly premium or
d) the end of the month in which the $250,000 maximum while covered under this Plan is reached, or
e) the day immediately preceding the date on which an individual receiving a Surviving Spouse's benefit under the Company pension plan remarries, or
f) the date this Plan terminates

Once you voluntarily terminate this coverage you will not have the opportunity to enroll again.

### DEPENDENT

Dependent coverage will automatically terminate on the earlier of:

a) The date of termination of the Employee's coverage under the Plan; or
b) The date the Employee fails to make any required contribution for dependent coverage; or
c) The date the dependent ceases to be an eligible dependent as defined in the Plan

You may elect to not cover eligible dependents if they have coverage under another Plan. However, you can only re-enroll the dependent if their other coverage terminates or during the Open Enrollment Period.

**See Continuation of Coverage under COBRA for options on continued coverage**

## CONTINUATION OF COVERAGE UNDER COBRA

VERY IMPORTANT NOTICE TO HEALTH PLAN PARTICIPANTS ON CONTINUATION COVERAGE RIGHTS

On April 7, 1986, the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA) was signed into law (Public Law 99-272, Title X). Under COBRA, most employers sponsoring group health plans must offer covered workers and their families the opportunity for a temporary extension of health coverage (called "continuation coverage") at group rates in certain instances where coverage under the plan would otherwise end. This notice is intended to inform plan participants, in a summary fashion, of their rights and obligations under the continuation coverage provisions of the COBRA law.

Plan participants should take the time to read this notice carefully.

An employee of the Employer covered by the Plan or a person otherwise covered under the plan by virtue of services (as an independent contractor, for example) to the Employer, has a right to choose continuation coverage if the employee loses group health coverage because of a reduction in hours of employment or the termination of employment (for reasons other than gross misconduct on the employee's part).

The spouse of an employee or other worker covered by the Plan has a right to choose this continuation coverage if the spouse loses group health coverage under Plan for any of the following four (4) reasons:

1)   The death of spouse;
2)   A termination of spouse's employment (for reasons other than gross misconduct) or reduction in spouse's hours of employment;
3)   Divorce or legal separation from spouse; or
4)   Spouse becomes entitled to Medicare.

In the case of a dependent child of an employee or other worker covered by the Plan, the child0 has the right to continuation coverage if group health coverage under the Plan is lost for any of the following five (5) reasons:

1)   The death of a parent;
2)   The termination of a parent's employment (for reasons other than gross misconduct) or reduction in a parent's hours of  employment with the Employer;
3)   Parents' divorce or legal separation;
4)   A parent becomes entitled to Medicare; or
5)   The dependent ceases to be a "dependent child" under the Plan.

Note: Previously, the dependents of a covered employee were considered qualified beneficiaries only if they were covered under the group health plan on the day before the event triggering eligibility for COBRA coverage. Effective January 1, 1997, the definition of a qualified beneficiary has been changed to include a child who is born to or placed for adoption with an individual who is already receiving COBRA coverage.

Under COBRA, the covered worker or a family member has the responsibility to inform the Plan Administrator of a divorce, legal separation, or a child losing dependent status under the Plan. Such notice must be made within 60 days of the event or the date on which coverage would be lost because of the event.  The Employer has the responsibility to notify the Plan Administrator of the covered worker's death, termination of employment or reduction in hours, or entitlement to Medicare.

Health care continuation rights also are available to covered retirees, their spouses, and widows or widowers of covered retirees, if they should lose group health coverage in the event that the Employer files for bankruptcy.

When the Plan Administrator is notified that one of the above named events has happened, the Plan Administrator will in turn notify the participant that the participant has the right to choose continuation coverage. Under the COBRA law, the participant has at least 60 days from the date the participant would lose coverage because of one of the events described above to inform the Plan Administrator that the participant wants continuation coverage.

If the participant does not choose continuation coverage, group health coverage will end.

If the participant chooses continuation coverage, the Employer is required to give the participant coverage which, as of the time coverage is being provided, is identical to the coverage provided under the plan to similarly situated employees or family members. The COBRA law requires that the participant be afforded the opportunity to maintain continuation coverage for 36 months (i.e., 3 years) unless the participant lost group health coverage because of a termination of employment or reduction in hours. In that case, the required continuation coverage period is 18 months. The 18-month period may be extended to 36 months if a second event (e.g., divorce, legal separation, death, or Medicare entitlement) occurs during that 18-month period.

## CONTINUATION OF COVERAGE UNDER COBRA

Note: If a qualifying event occurs less than 18 months after the date an employee becomes entitled to Medicare benefits, the coverage period for qualified beneficiaries other than the employee is extended to 36 months from the date of the employee's Medicare entitlement.

Moreover, the 18-month period may be extended for an additional 11 months (for a total of 29 months) if an individual is determined to be disabled (under the rules for Social Security disability benefits) and the plan administrator is notified of that determination within 60 days. The affected individual also must notify the Plan Administrator when it is determined (for purposes of Social Security disability benefits) that the individual is no longer disabled. The disability extension will also apply if the individual becomes disabled at any time during the first 60 days of continuation coverage. In addition, family members of the disabled individual are entitled to the 29-month extended coverage period, whether or not they are disabled.

The COBRA law provides that continuation coverage may be cut short of the full coverage period -- 18, 29, or 36 months -- for any of the following reasons:

1)  The Employer no longer provides group health coverage to any of its employees;
2)  The premium for continuation coverage is not paid;
3)  The individual becomes covered under another group health plan that does not contain any provision restricting or limiting coverage of a "pre-existing medical condition";
4)  The individual becomes entitled to Medicare;
5)  There has been a final determination that the individual is no longer disabled, for beneficiaries who qualified for an extra 11 months continuation coverage based on their disability at termination or within the first 60 days.

Note: The circumstances under which group health plans can apply coverage limitations or exclusions for pre-existing conditions will be restricted in plan years beginning on or after July 1, 1997, or later for plans maintained under collective bargaining agreements. For COBRA beneficiaries who enroll in another group health plan, the new restrictions may eliminate coverage limits based on pre-existing conditions, thus allowing prior employers to terminate continuation coverage.

The individual does not have to show that they are insurable to choose continuation coverage. However, under the COBRA law, the individual may have to pay all or part of the premium for continuation coverage. A minimum 30-day "grace period" will be allowed for the individual to pay the regularly scheduled premiums. (COBRA also provides that at the end of the 18, 29, or 36-month continuation coverage period the individual must be allowed to enroll in an individual conversion health plan if provided under the Plan.)

Participants may contact the Plan Administrator with any questions about COBRA. Also, participants should notify the Plan Administrator with any change in marital status, or if the employee or spouse has changed address.



## HOW TO FILE A CLAIM

If you always use participating Providers, your claims will be filed for you.  Simply present your identification card to your participating Provider when you receive services.  You will be responsible only for the Deductible, Copayment and/or Coinsurance amounts which apply to your coverage.  If your participating Provider charges more than the Allowable Charge for Covered Services, you are not responsible for the difference.

**If you must use a non-participating Provider, and the Provider will not file your claim for you, follow the instructions below for filing your claim.**

### HOSPITAL

Have the Hospital Admitting Clerk complete the Hospital Claim Report and attach their billing. Be sure this form includes the Group Number.  Payment will be sent to you.

### MEDICAL

Ask your doctor to complete an itemized Physician's Statement and attach his billing. Be sure the Group Number is included on the form.  Payment will be sent to you.

**IF THIS PLAN IS PAYING AS SECONDARY TO MEDICARE, ALL BILLS SHOULD BE SENT DIRECTLY TO THE CLAIMS ADMINISTRATOR**

**CLAIMS ADMINISTRATOR**
Blue Cross and Blue Shield of
Oklahoma
P O Box 3028
Tulsa, Oklahoma 74101-3028


### PROOF OF LOSS

Written proof of loss for which a claim is being made must be submitted to the Claims Administrator within 12 months after the date of loss, if reasonably possible. If it is not reasonably possible to submit proof within this time, the claim will be considered for payment if it is submitted as soon as reasonably possible.

### BENEFIT DETERMINATIONS FOR PROPERLY FILED CLAIMS

Once the Claims Administrator receives a Properly Filed Claim from you or your Provider, a Benefit determination will be made within 30 days.  This period may be extended one time for up to 15 additional days, if the Claims Administrator determines that additional time is necessary due to matters beyond our control.

If the Claims Administrator determines that additional time is necessary, you will be notified, in writing, prior to the expiration of the original 30-day period, that the extension is necessary, along with an explanation of the circumstances requiring the extension of time and the date by which the Claims Administrator expects to make the determination.

Upon receipt of your claim, if the Claims Administrator determines that additional information is necessary in order for it to be a Properly Filed Claim, they will provide written notice to you, prior to the expiration of the initial 30-day period, of the specific information needed.  You will have 45 days from receipt of the notice to provide the additional information.  The Claims Administrator will notify you of its Benefit determination within 15 days following receipt of the additional information.

The procedure for appealing an adverse Benefit determination is set forth in the section entitled, "***Complaint/Appeal Procedure.***"

## COMPLAINT/APPEAL PROCEDURE

The Plan Administrator has established the following process to review Covered Person dissatisfactions, complaints and/or appeals. If you have designated an authorized representative, that person may act on your behalf in the appeal process.

If you have a question or complaint, an initial attempt should be made to resolve the problem by directly communicating with a Blue Cross and Blue Shield of Oklahoma Customer Service Representative. In most cases, a Customer Service Representative will be able to provide you with a satisfactory solution to your problem. However, if a resolution cannot be reached in an informal exchange, you may request an administrative review of the problem through our appeal process described below.

You may request to review information used to make any adverse determination. Copies will be provided free of charge.

*Level I – Appeal*

- **How and When to File an Appeal**

  If you are not satisfied with the initial attempt to resolve your problem, or if you wish to request a review of a Benefit determination or Precertification decision, you must request an appeal within 180 days from the date you received notice of the adverse Benefit determination or Precertification notice.

  – **How to File an Appeal Involving a Non-Urgent Request or Claim**

    In the case of an appeal involving a non-urgent request or claim, you must submit your request in writing to the following address:

    Appeal Coordinator — Customer Service Department
    Blue Cross and Blue Shield of Oklahoma
    P. O. Box 3283
    Tulsa, Oklahoma 74102-3283

    The written request should include the name of the Covered Person, the Covered Person identification number, the nature of the complaint, the facts upon which the complaint is based, ***and the resolution you are seeking***. Necessary facts are: dates and places of services, names of Providers of services, place of hospitalization and types of services or procedures received (if applicable). You should include any documentation, including medical records, that you want to become a part of the review file. The Plan may request further information if necessary.

  – **How to File an Appeal of a Precertification Request Involving Urgent Care**

    If you wish to appeal a Precertification Request Involving Urgent Care, you may appeal by calling the Precertification number shown on your Identification Card.

- **The Appeal Process**

  – **Appeal Involving a Non-Urgent Request or Claim**

    The Plan's Benefits Administration staff will review your appeal, unless it involves medical judgment. Appeals that require medical judgment are reviewed by a Medical Director of Blue Cross and Blue Shield of Oklahoma. In deciding an appeal of any adverse Benefit determination that is based in whole or in part on a medical judgment, including determinations with regard to whether a particular treatment, drug, or other item is Experimental, Investigational, or not Medically Necessary or appropriate, the Plan may consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment.

    o In the case of an appeal involving a non-urgent Precertification request, the Plan will provide a written response to you no later than 30 days following the date we receive your appeal.

    o In the case of an appeal involving a claim other than a Precertification request, the Plan will provide a written response to you no later than 60 days following the date we receive your appeal.

  – **Appeal of a Precertification Request Involving Urgent Care**

    A "Precertification Request Involving Urgent Care" (see page 9) will be reviewed by a Medical Director of Blue Cross and Blue Shield of Oklahoma. In deciding an appeal of any adverse Benefit determination that is based in whole or in part on a medical judgment, including determinations with regard to whether a particular treatment, drug, or other item is Experimental, Investigational, or not Medically Necessary or appropriate, the Plan may consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment.

    The Plan will respond to you no later than 72 hours after receipt of your appeal request.

NOTE: The Plan's response to a Precertification Request Involving Urgent Care, including an adverse determination, if applicable, may be issued orally. A written notice will also be provided within three days following the oral notification.

*Level II – Voluntary Reconsideration Process*

After exhaustion of the appeals process outlined above, you may elect to submit your Benefit dispute to the Plan Administrator for reconsideration. We will provide you with information necessary to make an informed judgment about the Plan's voluntary review process.

The Plan Administrator will not charge you any fees or costs as a part of the voluntary review process. If you elect to pursue your voluntary review rights, any statute of limitations or other defense based on timeliness will be tolled during the time that any voluntary review is pending.

The Plan cannot claim that you failed to exhaust the administrative remedies available to you for failing to submit the Benefit dispute to the Plan's voluntary review process.

To request a Level II reconsideration of your Benefit determination, you should submit your request in writing to the following address:

Sheffield Steel Corporation
P O Box 218
Sand Springs, OK 74063

The written request should include the name of the Covered Person, the Covered Person identification number, the nature of the complaint, the facts upon which the complaint is based, ***and the resolution you are seeking.*** Necessary facts are: dates and places of services, names of Providers of services, place of hospitalization and types of services or procedures received (if applicable). You should include any documentation, including medical records, that you want to become a part of the review file. The Plan may request further information if necessary.

- Medical Review

  A review of any adverse Benefit determination that is based in whole or in part on a medical judgment, including determinations with regard to whether a particular treatment, drug, or other item is Experimental, Investigational, or not Medically Necessary or appropriate, will be referred to a health care professional who has appropriate training and experience in the applicable field of medicine.

**Please keep in mind that you are not obligated by the Group Health Plan to pursue or exhaust a Level II voluntary review before bringing a civil action. If these review processes do not provide a satisfactory resolution to your claim for Benefits, legal remedies are available, including pursuing your claim in court.**



## PLAN MODIFICATIONS AND AMENDMENT

The Employer may from time to time modify or amend this Plan or any benefits under this Plan at its sole discretion by a written instrument, identified as a Plan amendment, signed by a *Corporate Officer of the Employer.* Any changes made shall be binding on each covered person. Any modifications or amendments which affect covered persons will be communicated to them.

This Plan may be terminated in whole or in part at any time by a written instrument signed by a *Corporate Officer of the Employer.*

Notice of Plan termination shall be given to Participants by the Company prior to the effective date of the termination.



## ERISA INFORMATION

**Name Of Plan**
Sheffield Steel Corporation Retired Health and Welfare Plan (which has been established pursuant to the Group Insurance Plan for Hourly Retired Associates)

**Group Number**
9749-08

**Policyholder/Employer**
Sheffield Steel Corporation
PO Box 218
Sand Springs, OK 74063

**Employer Identification Number And Plan Number**
74-2191557         501

**Type Of Plan**
Group Medical and Paid Prescriptions

**Type Of Administration**
The Plan is administered by the Plan Administrator, who has access to all the Plan's records, who supervises the operation of the Plan, and who interprets the Plan's provisions.

**Plan Administrator**
Sheffield Steel Corporation
PO Box 218
Sand Springs, OK 74063
(918) 245-1335

**Claims Administrator**
Blue Cross and Blue Shield of
Oklahoma
P O Box 3028
Tulsa, OK 74101-3028
(918) 586-7700

**Agent For Service Of Legal Process**
For disputes arising under this Plan, service of legal process may be made on the Plan Administrator at the above address.

**The Sources Of Contribution To The Plan**
This Plan is funded by contributions from Sheffield Steel Corporation and the Employee.

The Plan Year ends for purposes of maintaining the Plan's fiscal records on
April 30

**Claims**
The procedure to be followed in presenting claims for benefits under the Plan and remedies for the redress of claims which are denied in whole or in part are described earlier in this booklet.

STATEMENT OF ERISA RIGHTS

## WHAT ARE YOUR RIGHTS UNDER ERISA?

As a participant in this Plan, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that all Plan participants shall be entitled to:

**Receive Information About Your Plan and Benefits**

Examine, without charge, at the Plan Administrator's office and at other specified locations, such as worksites and union halls, all plan documents governing the Plan, including insurance contracts and collective bargaining agreements, and a copy of the latest annual report (Form 5500 Series) filed by the Plan with the U.S. Department of Labor, and available at the Public Disclosure Room of the Pension and Welfare Benefit Administration.

Obtain, upon written request to the Plan Administrator, copies of documents governing the operation of the Plan, including insurance contracts and collective bargaining agreements, and copies of the latest annual report (Form 5500 Series) and updated summary plan description. The Administrator may make a reasonable charge for the copies.

Receive a summary of the Plan's annual financial report. The Plan Administrator is required by law to furnish each participant with a copy of this summary annual report.

**Continue Group Health Plan Coverage**

Continue health care coverage for yourself, spouse or dependents if there is a loss of coverage under the Plan as a result of a qualifying event. You or your dependents may have to pay for such coverage. Review this summary plan description and the documents governing the Plan on the rules governing your COBRA continuation coverage rights.

Reduction or elimination of exclusionary periods of coverage for pre-existing conditions under your group health plan, if you have creditable coverage from another plan. You should be provided a certificate of creditable coverage, free of charge, from your group health plan or health insurance issuer when you lose coverage under the plan, when you become entitled to elect COBRA continuation coverage, when your COBRA continuation coverage ceases, if you request it before losing coverage, or if you require it up to 24 months after losing coverage. Without evidence of creditable coverage, you may be subject to a pre-existing condition exclusion for 12 months (18 months for late enrollees) after your enrollment date in your coverage.

**Prudent actions by Plan Fiduciaries**

In addition to creating rights for Plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate your plan, called "fiduciaries" of the plan, have a duty to do so prudently and in the interest of you and other plan participants and beneficiaries. No one, including your employer, your union, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA.

**Enforce Your Rights**

If your claim for a welfare benefit is denied, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of plan documents or the latest annual report from the Plan and do not receive them within 30 days, you may file suit in a Federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the administrator. If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or Federal court.

In addition, if you disagree with the Plan's decision or lack thereof concerning the qualified status of a domestic relations order or a medical child support order, you may file suit in Federal court. If it should happen that Plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a Federal court. The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

## STATEMENT OF ERISA RIGHTS

**Assistance with Your Questions**

If you have any questions about your Plan, you should contact the Plan Administrator. If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the Plan Administrator, you should contact the nearest office of the Pension and Welfare Benefits Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Pension and Welfare Benefits Administration, U.S. Department of Labor, 200 Constitution Avenue, N.W., Washington, D.C. 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Pension and Welfare Benefits Administration.

## DISCRETIONARY AUTHORITY

The Plan Administrator or Fiduciary is expressly given discretionary authority to determine eligibility for benefits or to construe the terms of the Plan.

---

## *Special Notice to the Employees of Sheffield Steel Corporation*

---

**PLEASE INSERT THIS PAGE IN YOUR SUMMARY PLAN DESCRIPTION**

**Effective January 1, 2006, your Summary Plan Description is amended as set forth below.**

The **Group Insurance Plan for Salary Retired Associates, Sand Springs Division and Hourly Retired Associates, Sand Springs Division** is amended as follows:

If a Covered Person elects coverage under Medicare Part D, such Covered Person will no longer be eligible for Prescription Drug Benefits under the Employer's Group Insurance Plan.

* * * * * * * * * * *

*Except as amended, the Summary Plan Description remains the same.*

**ACTIONS IN WRITING**
**OF THE**
**BOARD OF DIRECTORS**
**OF**
**GERDAU AMERISTEEL US INC.**

**TAKEN AS OF AUGUST 31, 2011**
**BY WRITTEN CONSENT**
**IN LIEU OF A MEETING**

The undersigned, being all the members of the Board of Directors of Gerdau Ameristeel US Inc., a Florida corporation (the "Company"), pursuant to Section 607.0821 of the Florida Business Corporation Act, as amended, do hereby consent to the adoption of, and do hereby confirm, approve, adopt and ratify the actions set forth in this document (this "Written Consent"). This Written Consent shall be dated and shall be effective as of the date first written above.

**WHEREAS,** the Corporation has previously adopted the Gerdau Ameristeel US Retiree Medical Plan (the "**Plan**"); and

**WHEREAS,** the Corporation is authorized and empowered to amend the Plan; and

**WHEREAS,** the Board of Directors has determined that it is advisable and in the best interests of this Corporation to amend the eligibility of the Plan as set forth in the attached Exhibit A.

**NOW, THEREFORE, BE IT RESOLVED** that the Plan amendment set forth in the attached Exhibit A, and the terms and provisions thereof be, and hereby are, in all respects approved and adopted.

**RESOLVED,** that the officers and the benefits director of this Corporation be, and they hereby are, authorized and directed in the name of and on behalf of the Corporation, and under its corporate seal, or otherwise, to take such additional actions and execute such documents as they deem necessary or appropriate to carry out the intent and accomplish the purposes of the foregoing resolutions.

**Counterpart Execution**

**RESOLVED,** that the directors of this Corporation be, and each of them hereby is, authorized to execute this written consent in one or more counterparts and that, upon such execution by all of the directors of this Corporation, this written consent be, and as of that time it hereby is, approved and adopted as the act and deed of the Board of Directors of this Corporation.

* * * * * * * * * *

August 31, 2011 — Guilherme Johannpeter

August 31, 2011 — André Pires de Oliveira Dias

August 31, 2011 — Carl W. Czarnik